**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRUSH WELLMAN, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:03 CV 230 |
| | ) | |
| -vs- | ) | Judge:  Christopher A. Boyko |
| | ) | |
| **JENERIC/PENTRON, INC., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ————————————————— | ) | |
| | ) | |
| **JENERIC/PENTRON, INC., et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:04 CV 721 |
| | ) | |
| -vs- | ) | Judge:  Christopher A. Boyko |
| | ) | |
| **BRUSH WELLMAN, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
JENERIC/PENTRON, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MOTION IN THE ALTERNATIVE FOR COMPLETE SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

ISSUES PRESENTED AND SUMMARY OF ARGUMENT .................................... vii

    I.      ISSUES PRESENTED ................................................................. vii

    II.     SUMMARY OF ARGUMENT ....................................................... vii

          A.     Pentron Is Entitled to Partial Summary Judgment on the Issue of Contractual Interpretation Because the Undisputed Material Facts Establish that the Certificates Apply Only to Specific Sales of Beryllium that Brush Made to Pentron Between 1990 and 1995 .......... viii

          B.     Unresolved Issues of Material Fact Affecting the Scope of Brush's Legitimate Recovery Under the Contracts Preclude Summary Judgment in Brush's Favor on the Issue of Damages ............................ ix

          C.     As Interpreted by Brush, the Contracts Are Unconscionable ................... x

MEMORANDUM OF LAW ............................................................................... 1

    I.      STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................... 1

          A.     The Parties' Course of Dealing ............................................... 1

          B.     The Indemnification Certificates ............................................ 3

          C.     Brush's Contemporaneous Representations Regarding the Meaning of the Certificates ............................................................ 5

          D.     The Underlying Cases ......................................................... 6

    II.     SUMMARY JUDGMENT STANDARD ......................................... 10

    III.   APPLICABLE LAW .............................................................. 11

    IV.   ARGUMENT ...................................................................... 12

          A.     Pentron Is Entitled to Partial Summary Judgment on the Issue of Contractual Interpretation Because the Undisputed Material Facts Establish that the Certificates Apply Only to Losses Incurred by Reason of Specific Sales of Beryllium that Brush Made to Pentron Between 1990 and 1995 ....................................................... 12

               1.     General principles of contract interpretation ............................ 13

2.  Brush's interpretation of the Certificates is contrary to the Certificates' plain language ........................................................ 14

3.  Brush's interpretation of the Certificates is inconsistent with the parties' consistent course of dealing as reflected by the circumstances surrounding the execution of the five separate Certificates ................................................ 16

4.  Brush's "retroactive" interpretation of the Indemnification Certificates is contrary to well-established canons of contractual interpretation as consistently applied by courts that have addressed the issue ...................................................... 19

B.  Unresolved Issues of Material Fact Preclude Summary Judgment in Brush's Favor on the Issue of Damages ............................................ 21

C.  As Interpreted by Brush, the Contracts Are Unconscionable.................. 22

1.  The Certificates are procedurally unconscionable because Pentron had no meaningful choice but to sign them ................... 24

2.  As interpreted by Brush, the Certificates are substantively unconscionable ........................................................................ 28

V.  CONCLUSION ...................................................................................... 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 10

*Beryllium Metal & High-Beryllium Alloys from Kazakstan*, No. 731-T-746, 1997
    WL. 329460 (Ct. Int'l Trade Feb. 1997) ....................................................... 2

*Bunker Ramo-Eltra Corp. v. Fairchild Indus., Inc.*, 639 F. Supp. 409 (D. Md.
    1986) ..........................................................................................................19, 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................10, 22

*Chi. & Nw. Transp. Co. v. Emmet Fertilizer & Grain Co.*, 852 F.2d 358 (8th Cir.
    1988) ..........................................................................................................18, 19

*City of Toledo v. Beazer East, Inc.*, No. 96-3500, 1996 U.S. App. LEXIS 30858
    (6th Cir. Nov. 22, 1996) ............................................................................... 13

*Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653 (6th Cir. 2000) .................................. 10

*GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804 (6th Cir. 1999) ...................11, 13

*Gulf States Airgas, Inc. v. Am. Marine Constr., Inc.*, No. 98-0821 Section "N",
    1999 U.S. Dist. LEXIS 1628 (N.D. La. Feb. 11, 1999) .............................. 20

*Hawkins Constr. Co. v. First Fed. Sav. & Loan Ass'n*, 416 F. Supp. 388 (S.D. Iowa
    1976) .......................................................................................................... 20

*Johnson v. Mobil Oil Corp.*, 415 F. Supp. 264 (E.D. Mich. 1976) ............................... 24

*Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672 (6th Cir. 2000)........ 13

*Miele v. Equitable Life Assurance Co.*, No. 99 Civ 11048 (KNF), 2002 U.S. Dist.
    LEXIS 5284 (S.D.N.Y. Mar. 29, 2002) ..................................................... 20

*Paredes v. Hilton Int'l*, 896 F. Supp. 223 (D.P.R. 1995) ............................................ 20

*Prim Secs. Inc. v. McCarthy*, No. 05-CV-783, 2006 U.S. Dist. LEXIS 55754
    (N.D. Ohio Aug. 10, 2006) ......................................................................... 20

*United States v. Cont. Cas. Co.*, 49 F. Supp. 717 (D. Md. 1943) .................................... 20

*United States v. Bedford Assocs.*, 657 F.2d 1300 (2d Cir.1981) ..................................... 29

iii

**STATE CASES**

*A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473 (Cal. Ct. App. 1982) ............. 24

*Aetna Life & Cas. Ins. Co. v. Balancing Co., Inc.*, No. 10275, 1988 WL. 4349
(Ohio Ct. App. Jan. 15, 1988) .......................................................................... 13, 14

*Akro-Plastics v. Drake Indus.*, 685 N.E.2d 246 (Ohio Ct. App. 1996) ............................ 11

*Allen v. Mich. Bell Tel. Co.*, 171 N.W.2d 689 (Mich. Ct. App. 1969) ........................ 24, 25

*Allen v. Standard Oil Co.*, 443 N.E.2d 497 (Ohio 1982) ................................................ 11

*Am. Cyanamid Co. v. Ring*, 286 S.E.2d 1 (Ga. 1982) ...................................................... 20

*Buckeye Union Ins. Co. v. Rex Reliable Heating & Air Conditioning*, No. 1995
CA 00131, 1996 Ohio App. LEXIS 742 (Stark Co. Ct. App. Feb. 12, 1996) ............. 22

*Burr v. Lichtenheim*, 460 A.2d 1290 (Conn. 1983) ........................................................ 11

*Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624 (Ohio 1989) ........ 23

*Collins v. Click Camera & Video, Inc.*, 621 N.E.2d 1294 (Ohio Ct. App. 1993) ........ 23, 24

*Constr. Assocs. v. Fargo Water Equip. Co.*, 446 N.W.2d 237 (N.D. 1989) ...................... 24

*Discount Fabric House of Racine, Inc. v. Wis. Tel. Co.*, 345 N.W.2d 417 (Wis.
1984) .......................................................................................................................... 24

*Evans v. Graham Ford, Inc.*, 442 N.E.2d 777 (Ohio Ct. App. 1981) .............................. 23

*Evans v. Howard R. Green Co.*, 231 N.W.2d 907 (Iowa 1975) ....................................... 20

*Karat Gold Imports, Inc. v. United Parcel Serv., Inc.*, 577 N.E.2d 115 (Ohio Ct.
App. 1989) .......................................................................................................... 13, 14

*Lake Ridge Acad. v. Carney*, 613 N.E.2d 183 (Ohio 1993) ........................................... 23

*Miller v. Household Realty Corp.*, No. 2003-Ohio-3359, 2003 WL. 21469782
(Ohio Ct. App. June 26, 2003) ................................................................................... 29

*Nunnery v. Baker*, 195 So. 314 (Miss. 1940) ................................................................. 20

*Oehrtman v. Third Nat'l Bank & Trust*, 573 N.E.2d 710 (Ohio Ct. App. 1988) ............... 14

*Pittsfield Weaving Co. v. Grove Textiles, Inc.*, 430 A.2d 638 (N.H. 1981) ...................... 24

*Podhaskie v. Seventh Chelsea Assocs.*, 770 N.Y.S.2d 332 (N.Y. App. Div. 2005) ........... 20

*Reynolds v. Physicians Ins. Co. of Ohio*, 623 N.E.2d 30 (Ohio 1993) ............................ 22

*Salt River Project v. Westinghouse Elec. Corp.*, 694 P.2d 198 (Ariz. 1984) ................... 23

*Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499 (Ohio 1992) ................................... 13

*Temmel v. 1515 Broadway Assocs., L.P.*, 795 N.Y.S.2d 234 (N.Y. App. Div. 2005) ........ 20

*Wing v. Anchor Media Ltd.*, 570 N.E.2d 1095 (Ohio 1991) ............................................ 22

*Worth v. Aetna Cas. & Sur. Co.*, 513 N.E.2d 240 (Ohio 1987) ....................................... 13

## DOCKETED CASES

*Blackstock v. Jensen/Pentron, Inc.*, No. 1:030-cv-02305-CAB (Hinds County,
Miss. Aug. 31, 2004) .................................................................................................. 8

*Hill v. Brush Wellman Engineered Materials, Inc., et al.*, No. WMN 05 CV 254
(D. Md. May 10, 2005)....................................................................... 1, 3, 4, 7, 8, 27

*Millangue v. Jeneric/Pentron, Inc., et al.*, No. 02-62300-4 (Nueces County, Tex.
Jan. 15, 2003) ............................................................................................................ 9

*Simon, et al. v. Brush Wellman, Inc., et al.*, No. 2003 CA 006597AO (Palm Beach
County, Fla. June 23, 2003) ..................................................................................... 10

## STATUTES

Local Rule 7.1(f)   ......................................................................................................... vi

OHIO REV. CODE ANN. § 1301.11 ...............................................................13, 14, 16

OHIO REV. CODE ANN. § 1302.11................................................................................ 14

OHIO REV. CODE ANN. § 1302.15...................................................................23, 28, 29

## MISCELLANEOUS

42 C.J.S. Indemnity § 9 ............................................................................ 21

42 C.J.S. Indemnity § 13 .......................................................................... 19

10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
    2730.1 (3d ed. 1998) ........................................................................ 21

Ohio Jur. 3d Contracts § 120 (emphasis added) ........................................ 14

Restatement (Second) of Conflict of Laws § 145 cmt. d ............................ 11

Restatement (Second) of Contracts § 211(3) ......................................... 18, 19

Williston on Contracts § 31:4 ................................................................... 14

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT[1]

I.     ISSUES PRESENTED

Defendant Jeneric/Pentron, Inc.'s (Pentron) opposes in its entirety Plaintiff Brush

Wellman, Inc.'s (Brush's) Motion for Summary Judgment.  Pentron also cross-moves for partial

summary judgment on the issue of contractual interpretation and moves in the alternative for

complete summary judgment.  The parties' motions require the Court to resolve three issues:

1.     Whether the undisputed facts establish that the indemnity contracts at issue in this

case apply only to losses incurred by reason of specific sales of beryllium that

Plaintiff Brush Wellman, Inc. (Brush) made to Pentron between 1990 and 1995.

2.     Whether unresolved issues of material fact preclude summary judgment in

Brush's favor on the issue of damages.

3.     Whether the contracts, as interpreted by Brush, are unconscionable and

unenforceable as a matter of law.

II.    SUMMARY OF ARGUMENT

Pentron's memorandum of points and authorities presents three principal arguments in

support of the present motion:

---

[1] Pentron has included this statement of the issues presented and summary of the
argument in accordance with Local Rule 7.1(f).

A.  <u>Pentron Is Entitled to Partial Summary Judgment on the Issue of Contractual Interpretation Because the Undisputed Material Facts Establish that the Certificates Apply Only to Specific Sales of Beryllium that Brush Made to Pentron Between 1990 and 1995.</u>

Beginning in the early 1980s[2] and ending in 1995, Pentron purchased pure beryllium from Brush for use in the manufacture of Rexillium, a dental compound.  Through 1989, Pentron was able to purchase beryllium from Brush without having to sign any indemnification documents.  Beginning in late 1989, however, Brush required Pentron to sign a pre-printed "Indemnification Certificate" each time the parties agreed to a sale of beryllium for the subsequent year(s).  The parties executed five such Certificates in all, each in connection with a discrete sale of beryllium.

Brush now claims that these Certificates require Pentron "to protect Brush from any litigation relating to Pentron's use of beryllium, past or future."  (Brush Mot. Summ. J. at 16).  As evidenced by its claimed entitlement to unlimited indemnity in the underlying cases, Brush interprets the Certificates to require Pentron to indemnify it not only for losses attributable to sales that occurred prior to the execution of the first Certificate, but even for losses attributable to sales that Brush made to third parties, and for Brush's own intentional torts.  In two of the underlying cases, there is not even any evidence that Brush Wellman beryllium was used in the product that Pentron supplied to the plaintiff's employer.

Brush's interpretation of the Certificates is wrong.  To reach it, Brush has had to disregard not only the law, but also the plain language of the Certificates and the undisputed material facts of this case, which unambiguously reflect the parties' shared understanding that the Certificates

---

[2] The year in which the parties' relationship first commenced has not been established with certainty.  The earliest date supported by any evidence produced by Brush is sometime in 1983.

applied only to losses incurred by reason of the specific sales of beryllium in connection with
which they were executed.  This Court should reject Brush's motion for summary judgment
because it rests on an incorrect and unsupportable interpretation of the Certificates, and should
grant Pentron's motion for partial summary judgment on the issue of contractual interpretation.

        B.      <u>Unresolved Issues of Material Fact Affecting the Scope of Brush's Legitimate
Recovery Under the Contracts Preclude Summary Judgment in Brush's Favor on
the Issue of Damages.</u>

Brush's motion for summary judgment on the issue of damages must fail along with its
incorrect interpretation of the Certificates.  Brush bears the burden of proving its damages and
the amount of those damages at trial.  Brush's failure to submit sufficient evidence of its damages
is therefore fatal to its motion for summary judgment on this issue.  Brush has not even
attempted o prove how much of its claimed damages are properly attributable to sales of
beryllium to Pentron to which an Indemnification Certificate applied.  Only by claiming an
automatic and unlimited right to indemnification for all the costs it has incurred in the underlying
cases can Brush possibly argue that its damages are ripe for summary adjudication.

Brush simply is not entitled to recover all costs arising out of any suit that relates in any
way, however marginal, to beryllium that it sold to Pentron at any time, and it certainly is not
entitled to recover for costs arising out its own intentional torts or sales to Pentron's competitors.
Brush cannot satisfy its burden under the Certificates merely by tallying its legal bills.  Rather,
Brush must show which of its costs were in fact caused by sales of beryllium to Pentron to which
an Indemnification Certificate applied.  To date, however, Brush has presented no evidence
tending to show which portion of its costs are compensable under the Certificates, and Brush's
claimed entitlement to 100 percent of its costs cannot withstand proper interpretation of the
Certificates.  Unresolved issues of material fact affecting the scope of Brush's legitimate

recovery under the contracts thus preclude summary judgment in Brush's favor on the issue of damages.

      C.     <u>As Interpreted by Brush, the Contracts Are Unconscionable.</u>

Brush's expansive interpretation of the Indemnification Certificates would transform Pentron from a limited indemnitor into a general liability insurer for Brush's beryllium business. So interpreted, the indemnity contracts at issue in this case present a genuine case of commercial unconscionability for two reasons:  First, Pentron had no meaningful choice but to sign the Certificates; second, the terms of the Certificates, as interpreted by Brush, are unreasonably favorable to Brush and oppressive to Pentron.  Should the Court adopt Brush's interpretation of the Certificates, Pentron therefore requests complete summary judgment in its favor on the ground that the Certificates are unconscionable and unenforceable as a matter of law.

**MEMORANDUM OF LAW**

I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

    A.    <u>The Parties' Course of Dealing</u>

    Defendant Jeneric/Pentron, Inc. (Pentron) is a family-owned medical supply company. Pentron is incorporated under the laws of Connecticut and has its principal place of business in Wallingford, Connecticut.  (Brush Am. Compl. ¶ 2, Docket No. 40).  Now, and at all times relevant to this case, Pentron's business has consisted chiefly of the manufacture and sale of dental compounds.  (Brush Mot. Summ. J. at 2, Docket No. 32).

    Plaintiff Brush Wellman, Inc. (Brush) is a publicly traded mining and manufacturing conglomerate.  (Ex. A-1 at 2-14, Affidavit of Arthur M. Kaufman ("Kaufman Aff.") (2006 Annual Report on Form 10-K for Brush Engineered Materials, Inc.)).[3]  Brush is incorporated under the laws of Ohio and has its principal place of business in Cleveland, Ohio.  (Brush Am. Compl. ¶ 1).  Now, and at all times relevant to this case, Brush has mined, manufactured, and sold pure beryllium for use in a variety of commercial applications.  (Brush Mot. Summ. J. at 1; Ex. A-2 at 2, Kaufman Aff. ("Designing with Beryllium")).

    Beryllium is a metallic element.  (Brush Mot. Summ. J. at 1).  Beginning in the mid-1970s, Pentron used beryllium to make Rexillium, a dental compound composed of nickel, chromium, beryllium, molybdenum, aluminum, titanium, and cobalt.  (Brush Am. Compl. ¶ 8; Brush Mot. Summ. J. at 2; Ex. B ¶ 7, Affidavit of Arun Prasad ("Prasad Aff."); Ex. C at 9,

---

[3] Various exhibits are attached to the Kaufman Affidavit and will be referred to herein as "Ex. A-__ Kaufman Aff. (Document Description)."

Deposition of Arun Prasad ("Prasad Dep.")).[4]  Initially, Pentron tried to make Rexillium using an alloy of beryllium, but this caused serious quality problems that resulted in customer complaints and the erosion of Pentron's market position.  (Ex. B ¶¶ 9-11, Prasad Aff.; Ex. C at 15-19, Prasad Dep.).  As Pentron learned, pure beryllium is essential to the manufacture of Rexillium.  (Ex. B ¶ 12, Prasad Aff.).

Beginning in the early 1980s[5] and ending in 1995, Pentron purchased pure beryllium from Brush for use in the manufacture of Rexillium.  (Brush Am. Compl. ¶ 8; Ex. B ¶¶ 17-18, Prasad Aff.).  Pentron's relationship with Brush was born of necessity.  At all times relevant to this case, Brush owned and operated the only beryllium-producing mine in the United States.  (Ex. D at 33, Deposition of Larry Ryczek ("Ryczek Dep."); Ex. E at 43, Deposition of David Mylander ("Mylander Dep."); Ex. A-3 at 2, Kaufman Aff. ("Beryllium Copper")).  Prior to the relaxation of import restrictions on products from the former Soviet Union in the early 1990s, Brush was the sole source of pure beryllium available for purchase in the United States.  (Ex. E at 30-31, Mylander Dep.; Ex. B ¶ 13, Prasad Aff.).  Brush even boasted in its own advertising materials that it was "the only source of beryllium metal and beryllium oxide powder in the Western World."  (Ex. A-4 at 2, Kaufman Aff. ("Producing Defect Free Beryllium and Beryllium Oxide")).  As late as 1997, the United States Court of International Trade found that Brush "accounted for all production of domestic" beryllium metals and high-beryllium alloys.  *See Beryllium Metal & High-Beryllium Alloys from Kazakstan*, No. 731-TA-746, 1997 WL 329460,

---

[4] The deposition of Arun Prasad in this case is attached as an independent exhibit.  The deposition of Arun Prasad in the underlying case of *Hill v. Brush Wellman Engineered Materials, Inc., et al.* is attached as an exhibit to the Kaufman Affidavit.

[5] The year in which the parties' relationship first commenced has not been established with certainty.  The earliest date supported by any evidence produced by Brush is sometime in 1983.  (Ex. A-6 at 2, Kaufman Aff. (Dec. 3, 1993 Letter from Mylander to Prasad)).

at *6 (Ct. Int'l Trade Feb. 1997) (Ex. G).  Although Brush disputed its monopoly status

throughout much of this litigation, it has now stipulated that "[d]uring the years 1980-1993,

Brush Wellman was the sole fully integrated source of pure beryllium from which Jeneric

Pentron could purchase pure beryllium."  (Stipulation, Docket No. 68).

Brush exploited its monopoly position to exact high prices and other contractual

concessions from Pentron.  (Ex. B ¶ 14, Prasad Aff.).  Pentron objected to the terms that Brush

imposed, but continued to purchase from Brush because it could not obtain the pure beryllium it

needed to manufacture Rexillium from any other source.  (*Id.* ¶ 15).  Once pure Russian

beryllium became available for purchase in the United States sometime after 1993, Pentron

stopped purchasing beryllium from Brush.  (*Id.* ¶ 31; Ex. C at 54-60, Prasad Dep.; Ex. A-5, at

187, Kaufman Aff. (Prasad Dep. in *Hill v. Brush Wellman Engineered Materials, Inc., et al.*)).

Immediately upon the expiration of the parties' last purchase agreement in 1995, Pentron began

purchasing Russian-source beryllium for use in its Rexillium product.[6]  (Ex. B ¶ 32, Prasad Aff.;

Ex. A-5 at 187-95, Kaufman Aff. (Prasad Dep. in *Hill v. Brush Wellman Engineered Materials,

Inc., et al.*)).

B.      The Indemnification Certificates

Pentron's dealings with Brush comprised a series of discrete purchase agreements for

fixed amounts of pure beryllium at fixed prices per pound.  (Brush Am. Compl. ¶ 2; Brush Mot.

Summ. J. at 2; Ex. B ¶ 16, Prasad Aff.).  The first purchase agreement for which Brush has

produced documentary evidence was executed in 1983 and provided for the purchase and

shipment of 600 pounds of beryllium in 1984.  (Ex. A-6 at 2, Kaufman Aff. (Dec. 3, 1993 Letter

---

[6] Pentron sold its metals business on March 9, 2005 and no longer manufactures
Rexillium.

from Mylander to Prasad)). Pentron's last agreement with Brush was executed in 1993, and

provided for the purchase and shipment of 1200 pounds of beryllium over the two-year period

from 1994-95. (Ex. B ¶ 18, Prasad Aff.; Ex. A-5 at 187-95, Kaufman Aff. (Prasad Dep. in *Hill v.*

*Brush Wellman Engineered Materials, Inc., et al.*)). With the exception of the 1993 purchase

agreement, which covered a period of two years, the parties negotiated separate purchase

agreements each year. (Ex. B ¶ 19, Prasad Aff.; Ex. A-6 at 2, Kaufman Aff. (Dec. 3, 1993 Letter

from Mylander to Prasad)). Each discrete agreement separately established the quantity and

price of the beryllium Pentron would purchase in the year ahead. (Ex. B ¶ 19, Prasad Aff.).

Brush would then deliver the purchased beryllium to Pentron in a series of smaller periodic

shipments throughout the year. (*Id.*).

Through 1989, Pentron was able to purchase beryllium from Brush without having to

sign any indemnification documents. (*Id.* ¶ 20). Beginning in late 1989, however, in connection

with the parties' 1990 purchase agreement, Brush suddenly began to require Pentron to sign a

pre-printed "Indemnification Certificate" each time the parties agreed to a sale of beryllium.

(Brush Mot. Summ. J. at 3; Ex. B ¶ 21, Prasad Aff.). Pentron thus signed one Indemnification

Certificate on October 3, 1989, in connection with its agreement to purchase 650 pounds of

beryllium from Brush in 1990. (Brush Am. Compl. Ex. B; Ex. B ¶ 25, Prasad Aff.). Pentron

signed an identical Indemnification Certificate on October 4, 1990, another on October 2, 1991,

and yet another on October 19, 1992. (Brush Am. Compl. Exs. C-E; Ex. B ¶ 26, Prasad Aff.).

Each of these Certificates was executed in connection with an agreement to purchase a fixed

quantity of beryllium from Brush for delivery during the subsequent calendar year. (Brush Am.

Compl. ¶¶ 9, 13; Ex. B ¶ 26, Prasad Aff.). On December 15, 1993, Pentron signed one

Indemnification Certificate in connection with its agreement to purchase 1200 pounds of

beryllium from Brush to be delivered during the two-year period 1994-95.  (Brush Am. Compl. Ex. F; Ex. B ¶ 27, Prasad Aff.).  Consistent with the parties' practice of executing one Certificate in connection with each discrete purchase of beryllium, the parties did not execute a Certificate in 1994.  (Ex. B ¶ 27, Prasad Aff.).

This course of conduct objectively manifested the parties' shared understanding that each Certificate applied only to the specific sale of beryllium in connection with which it was executed.  (Ex. B ¶ 28, Prasad Aff.).  This understanding was consistent with the language of the Certificates, which state:

> [Pentron] agrees to indemnify and hold harmless [Brush] . . . against any demands, claims, lawsuits, liability, damage, judgment, expense or loss (including legal fees, expenses, and costs) relating in any way to beryllium . . . which [Brush] may incur or become subject to *by reason of its sale, supply or shipment of beryllium-containing products to [Pentron]*, including, without limitation any claims or lawsuits by employees of [Pentron], by any customer of [Pentron], or by any other third party.

(Brush Am. Compl. Exs. B-F (emphasis added)).  Read in light of the parties' execution of separate, identical Certificates each time Pentron purchased beryllium between 1990 and 1995, this language reflects the parties' shared understanding that each Certificate applied only to the specific sale of beryllium in connection with which it was executed.

C.  Brush's Contemporaneous Representations Regarding the Meaning of the Certificates

Pentron's understanding was confirmed by Brush's contemporaneous representations, many of which implied or expressly stated that specific Indemnification Certificates applied to specific sales or quantities of beryllium.  For example:

- The packing list that accompanied a March 19, 1992, shipment of beryllium to Pentron states:  "SIGNED INDEMNIFICATION STATEMENT DATED OCTOBER 1991 APPLIES TO THIS ORDER."  (Ex. A-7, Kaufman Aff. (packing list) (other examples attached)).

- The invoice for a March 15, 1994, shipment of beryllium to Pentron states: "SIGNED INDEMNIFICATION DOCUMENT OF DECEMBER 1993 APPLIES TO THIS ORDER."  (Ex. A-8, Kaufman Aff. (invoice) (other examples attached)).

- On October 26, 1992, Sue Ann Mullin, Brush's Contract Administrator, wrote to Pentron to confirm Pentron's October 22, 1992 order of 600 pounds of beryllium.  In this letter, Ms. Mullin stated:  "As in the past a new Indemnification Certificate is required.  Please sign and return the enclosed Indemnification Certificate."  (Ex. A-9, Kaufman Aff. (Oct. 26, 1992 Letter from Mullin to Prasad)).

In other correspondence with Pentron, Brush attempted to justify its ever-increasing prices by citing the possibility that it could incur significant costs in defending against lawsuits related to its beryllium sales to Pentron, despite the parties' execution of the Indemnification Certificates:

> The indemnification forms you sign protects [sic] Brush Wellman, but we would still have to expend significant legal fees in the event of a lawsuit!  This liability is factored into our pricing structure.

(Ex. A-10, Kaufman Aff. (Nov. 6, 1992 Letter from Chomich to Prasad)).  This correspondence manifested the parties' understanding that Brush would be entitled, at most, to some allocated portion of its legal fees, and not to the unqualified indemnification it now demands.

These and other similar statements reflected the parties' shared expectation that Brush would be required to prove that its claimed compensable losses actually arose by reason of contractually covered sales of beryllium before it could recover under the Indemnification Certificates.

D.    The Underlying Cases

Contrary to its own contemporaneous representations, Brush now claims an unlimited right to recover any cost it may incur in any lawsuit that relates in any way to beryllium that it is alleged to have sold to Pentron at any time.  (Brush Am. Compl. ¶ 9; Brush Mot. Summ. J. at 3).  As evidenced by its claimed entitlement to complete indemnification in the four underlying cases, Brush does not interpret the Certificates to apply only to losses incurred "by reason of" a

6

sale of beryllium to which an Indemnification Certificate applies.  Instead, Brush's claim reflects an interpretation of the Certificates that extends Pentron's indemnity obligation to *at least*:  (1) losses attributable entirely to beryllium exposures that occurred *before* any Indemnification Certificates had been executed; (2) losses attributable to beryllium exposures in cases in which there is no evidence that Pentron's product contained any Brush Wellman beryllium whatsoever; (3) losses that Brush incurred by reason of its sale of beryllium to Pentron's competitors; and (4) losses that Brush has incurred by reason of its own alleged intentional torts.  A brief recitation of the facts of the underlying cases illustrates the unlimited breadth of Brush's present claim to indemnification.

The plaintiff in *Hill v. Brush Wellman Engineered Materials, Inc., et al.*, No. WMN 05 CV 254 (D. Md. May 10, 2005), alleges that she developed chronic beryllium disease as a result of her exposure to dental alloys manufactured by Pentron and its competitor, Jensen Industries, Inc.  (Brush Am. Compl. Ex. I ¶ 16).  Ms. Hill alleges that this exposure occurred between January 1992 and January 2004, when she was employed at Roy-L Dental Lab.  (*Id.* ¶ 5).  Ms. Hill originally sued Pentron, Jensen, and Brush for negligence and strict products liability, and Brush for fraudulent concealment and civil conspiracy.  (*Id.* ¶¶  17-47).  Although Pentron first sold Rexillium to Roy-L Dental Labs on February 14, 1996—months *after* it had received its last shipment of beryllium from Brush, and *after* it had begun purchasing beryllium from a Russian source—Brush claims an entitlement to indemnification for *all* of the costs it has incurred in defending the *Hill* suit.  (Ex. A-5 at 187-95 Kaufman Aff. (Prasad Dep. in *Hill v. Brush Wellman Engineered Materials, Inc., et al.*); Ex. A-13 at 209-211, Kaufman Aff. (Hulteen Dep. in *Hill v. Brush Wellman Engineered Materials, Inc., et al.*); Ex. A-14 at 3, Kaufman Aff. (History of Shipments to Roy-L Dental Lab).  Brush cannot possibly prove that *all*, or even *any*, of these

costs were incurred "by reason of" its sale of beryllium to Pentron and has, to date, produced no evidence indicating that the Rexillium to which Ms. Hill claims exposure contained even a trace of Brush's beryllium.  Indeed, in its deposition of Dr. Prasad in the *Hill* case, Brush went to great lengths to establish that the Rexillium purchased by Roy-L Labs contained no Brush Wellman beryllium:

> UBERSAX:  So the beryllium received on December 8th of 1995, would have been used up in the manufacture of Rexillium during the month of December 1995; is that right?
>
> PRASAD:  Yes.
>
> ….
>
> UBERSAX:  So if the Rexillium was – was manufactured let's say by December 31, 1995 you would expect it would be shipped out to customers no later than January 10th?
>
> PRASAD:  Around that, yeah
>
> ….
>
> UBERSAX:  Is it correct that the 50 pounds of beryllium that you received from Brush Wellman on December 8, 1995 was probably manufactured into Rexillium in the month of December 1995 and shipped to customers in early January 1996?
>
> PRASAD:  Correct….

(Ex. A-5 at 189-91, Kaufman Aff. (Prasad Dep. in *Hill v. Brush Wellman Engineered Materials, Inc., et al.*)).  As Brush was so eager to establish in *Hill*, it appears that the Rexillium that Pentron sold to Roy-L Dental Labs in 1996 did not contain even a trace of Brush's beryllium, (*id.* at 189-91, 194-95), and that all of Brush's costs in the *Hill* suit have resulted from Brush's own alleged intentional torts and from its sale of beryllium to one of Pentron's competitors, Jensen.  Brush has failed to explain how it can claim that these costs were incurred "by reason of" contractually covered sales of beryllium to Pentron.

The plaintiffs in *Blackstock v. Jensen/Pentron, Inc.*, No. 1:030-cv-02305-CAB (Hinds County, Miss. Aug. 31, 2004), claimed that Charles Blackstock suffered "serious and permanent bodily injuries" as a result of his exposure to beryllium-containing dental alloys between 1980 and 2003 during his employment at Blackstock Dental Lab.  (Brush Am. Compl. Ex. J ¶¶ 13-14). As in *Hill*, Mr. Blackstock alleged that these alloys were produced by Pentron and its competitor, Jensen.  (*Id.* ¶ 9-10).  Pentron's only sales of Rexillium to Blackstock Dental Lab occurred in 1981 and 1982, however, *eight years before the execution of the first Indemnification Certificate between Brush and Pentron*.  (Ex. A-15 at 3, Kaufman Aff. (Blackstock Invoices)).  Again, as in *Hill*, Brush has produced no evidence indicating that the small amounts of Pentron's Rexillium to which Mr. Blackstock claimed exposure contained even a trace of Brush's beryllium, or that Brush's costs are in fact attributable to its possible but undocumented sales to Pentron, rather than its long-term sales to Jensen.  Indeed, the evidence in the underlying case shows that Pentron made, at most, several small shipments of Rexillium totaling $650 to the plaintiff's employer in 1981 and 1982, (*id.*), whereas Jensen made numerous shipments over Blackstock's two decades-plus employment at the dental lab.  Brush nevertheless insists that it is entitled to automatic indemnification for *all* of the costs it incurred in defending and settling the suit in *Blackstock*, despite the fact that some, and perhaps all, of its liability derives from sales to Jensen, not Pentron.

The plaintiffs in *Millangue v. Jeneric/Pentron, Inc., et al.*, No. 02-62300-4 (Nueces County, Tex. Jan. 15, 2003), alleged that Reginaldo Millangue died as a result of his exposure to dental alloys manufactured by Pentron from beryllium produced by Brush.  (Brush Am. Compl. Ex. G ¶ 5).  The *Millangue* plaintiffs claimed that Mr. Millangue was exposed to these alloys during the period of his employment as a dental technician at Cummins Dental Ceramics

9

between November 18, 1981, and January 31, 2001.  (Ex. A-16 at 6, Kaufman Aff. (Cummins Dep. in *Millangue v. Jeneric/Pentron, Inc., et al.*; Ex. A-17 at 1, Kaufman Aff. (Millangue Dep. in *Millangue v. Jeneric/Pentron, Inc., et al.*)).  The period of beryllium exposure alleged in the *Millangue* case thus includes a period of more than seven years *before* execution of the first Indemnification Certificate.  Although Brush cannot possibly prove that all of the costs it incurred in defending and settling the *Millangue* suit were incurred by reason of indemnifiable sales of beryllium to Pentron, Brush now claims an entitlement to complete indemnification for all costs related to the *Millangue* suit.

Finally, the plaintiffs in *Simon, et al. v. Brush Wellman, Inc., et al.*, No. 2003 CA 006597AO (Palm Beach County, Fla. June 23, 2003), allege that Margaret Simon contracted chronic beryllium disease as a result of her exposure to beryllium-containing dental alloys between 1985 and 1995.  (Brush Am. Compl. Ex. H ¶¶ 1, 14).  The period of exposure alleged in the *Simon* case thus includes a period of approximately four years *before* execution of the first Indemnification Certificate.  As in *Millangue*, Brush demands indemnification for all of the costs it incurred in defending the *Simon* suit, even though it cannot possibly prove that all of these costs were incurred by reason of covered sales of beryllium to Pentron.

## II.    SUMMARY JUDGMENT STANDARD

The Court may grant summary judgment on any or all of the issues presented "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

In contract actions, "summary judgment may be appropriate when the documents and evidence underlying the contract are undisputed and there is no question as to intent." *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 655 (6th Cir. 2000).  "Normally, however, disputed issues of contractual intent are considered to be factual issues which preclude an award of summary judgment." *Id.* at 655-56.  Even where a dispute has arisen as to the parties' contractual intent, however, summary judgment may be appropriate so long as the "evidence presented to the court supports only one of the conflicting interpretations." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 819 (6th Cir. 1999).

III.    APPLICABLE LAW

In the interest of expeditious resolution of the present motions, Pentron agrees that the Court may decide issues of contractual interpretation under the law of Ohio.  At their core, conflict of laws rules are designed to resolve *true conflicts* between forum law and the law of another jurisdiction.  Where no true conflict exists, the court is of course free to apply forum law. *See Akro-Plastics v. Drake Indus.*, 685 N.E.2d 246, 248 (Ohio Ct. App. 1996) ("Resort to the principles of conflict of laws is necessary only if there is an actual conflict between local law and the law of another jurisdiction.").  With respect to basic rules of contractual interpretation, construction, and unconscionability, Pentron is aware of no meaningful conflicts between the law of Ohio and the law of other jurisdictions bearing some relationship to this case.  There is, therefore, no present need for this Court to look beyond the law of Ohio for guidance in interpreting the contracts at issue here.[7]

---

[7] Pentron does *not*, however, agree with Brush's contention that Ohio law governs all matters of dispute between the parties.  It is, of course, commonplace for different issues arising in a single case to be governed by the laws of different jurisdictions.  *See* Restatement (Second) of Conflict of Laws § 145 cmt. d ("The courts have long recognized that they are not bound to decide all issues under the local law of a single state.").  One such issue is whether Brush may

IV.    ARGUMENT

    A.    <u>Pentron Is Entitled to Partial Summary Judgment on the Issue of Contractual
Interpretation Because the Undisputed Material Facts Establish that the
Certificates Apply Only to Losses Incurred by Reason of Specific Sales of
Beryllium that Brush Made to Pentron Between 1990 and 1995.</u>

At its core, this case involves a dispute over the meaning of the Indemnification

Certificates.  At different points in this litigation, Brush has stated its interpretation of the

Certificates in different ways.  In its Amended Complaint, Brush construes the Certificates to

mean that "Pentron agreed to indemnify Brush and hold Brush harmless against any claims

related to beryllium."  (Brush Am. Compl. ¶ 9).  In its Summary Judgment motion, Brush

interprets the Certificates to mean that "Brush is entitled to be indemnified and held harmless

against all claims relating to any beryllium sales to Pentron."  (Brush Mot. Summ. J. at 2).  The

principal characteristic these interpretations have in common is overbreadth.

As revealed by its demand for summary judgment on its claim for complete

indemnification in the underlying cases, Brush asserts an automatic and unlimited right to

indemnity for any cost it may incur in any lawsuit relating in any way to beryllium that it is

alleged to have sold to Pentron at any time.  In *Millangue*, *Simon*, and *Blackstock*, these costs

include costs that Brush has incurred by reason of sales that it made prior to the execution of the

first Certificate.  In *Hill* and *Blackstock*, Brush's costs include costs incurred solely by reason of

sales that Brush made to Pentron's competitors, and, in *Hill* even include costs that Brush

incurred by reason of its own alleged intentional torts.  Finally, although there is no evidence that

---

recover the costs it has incurred prosecuting the present action.  With respect to this issue, there
does appear to be a genuine conflict between the laws of Ohio and Connecticut.  *Compare Allen
v. Standard Oil Co.*, 443 N.E.2d 497, 500 (Ohio 1982) (indemnitor can recover fees incurred in
establishing right to indemnity) *with Burr v. Lichtenheim*, 460 A.2d 1290, 1296 (Conn. 1983)
(absent express language, indemnitor cannot recover fees incurred in establishing right to
indemnity).

the Rexillium at issue in *Blackstock* and *Hill* contained even a trace of Brush's beryllium, Brush claims a right to complete indemnification for all of the costs it has incurred in those actions.

To get so many angels to dance on the head of this particular contractual pin, Brush has had to:  (1) distort the natural meaning of the language of the Indemnification Certificates; (2) ignore the parties' course of dealing, consistent with the plain language of the Certificates; and (3) disregard familiar canons of contractual interpretation precluding retroactive application of indemnity contracts in the absence of express language of retroactivity.  This Court should not permit such a result.  Instead, the Court should deny Brush's motion for summary judgment and grant Pentron's motion for partial summary judgment on the issue of contractual interpretation.

    1.     General principles of contract interpretation.

The courts of Ohio interpret the language of an indemnity contract in such a way as to give effect to the intent of the parties.  *See Worth v. Aetna Cas. & Sur. Co.*, 513 N.E.2d 240, 253 (Ohio 1987).  Whenever possible, the Ohio courts take all words used in an indemnity contract "in their ordinary and popular sense."  *Id.*  Generally, Ohio courts presume that the language of a contract reflects the intent of the parties, but will look to other evidence "when the circumstances surrounding the agreement invest the language of the contract with special meaning," *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992), or when "two plausible interpretations exist," *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 684 n.12 (6th Cir. 2000).  *See also GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 817 (6th Cir. 1999); *City of Toledo v. Beazer East, Inc.*, No. 96-3500, 1996 U.S. App. LEXIS 30858, *6 (6th Cir. Nov. 22, 1996) (Ex. H) (both holding that reference to extrinsic evidence is permissible where contractual language is subject to more than one reasonable interpretation).

13

As commercial transactions, the contracts at issue in this case are governed by Article One of the Ohio Commercial Code. [8]  Section 1301.11 of the Commercial Code provides that "[t]he express terms of an agreement and an applicable course of dealing . . . shall be construed wherever reasonable as consistent with each other."  OHIO REV. CODE ANN. § 1301.11(D).  The courts of Ohio thus hold that "[i]n a commercial transaction, the meaning of the parties' agreement is to be determined by the language used by the parties, and the parties actions, read and interpreted in light of their course of previous dealings and usage of trade."  *Karat Gold Imports, Inc. v. United Parcel Serv., Inc.*, 577 N.E.2d 115, 119 (Ohio Ct. App. 1989) (applying § 1301.11 to a services contract); *see also* OHIO REV. CODE ANN. § 1301.11 cmt. 1.

> 2.  Brush's interpretation of the Certificates is contrary to the Certificates' plain language.

Brush is of course correct that where "'the language used by the parties [in a contract] is plain, complete, and unambiguous, the intention of the parties must be gathered from that language, and from that language alone.'"  (Brush Mot. Summ. J. at 16 (*quoting* Williston on Contracts § 31:4)).  Needless to say, however, clarity may not be manufactured by excising language from a contract, for hornbook law also instructs that "[a] contract is read as a whole, giving effect to *every part* of the agreement."  Ohio Jur. 3d Contracts § 120 (emphasis added).

---

[8] Article One of the Ohio Commercial Code applies generally to "commercial transactions," and not only to "sales of goods," which are governed by Article Two.  *See Karat Gold Imports, Inc. v. United Parcel Serv., Inc.*, 577 N.E.2d 115, 119 (Ohio Ct. App. 1989) (applying § 1301.11 to a services contract); *Aetna Life & Cas. Ins. Co. v. Balancing Co., Inc.*, No. 10275, 1988 WL 4349 (Ohio Ct. App. Jan. 15, 1988) (applying § 1301.11 to a services contract) (Ex. I); *Oehrtman v. Third Nat'l Bank & Trust*, 573 N.E.2d 710, 711-12 (Ohio Ct. App. 1988) (applying § 1301.11 to a mortgage contract).  Articles One and Two both instruct the court to consider the parties' course of dealing when interpreting a contract.  *See* OHIO REV. CODE ANN. §§ 1301.11, 1302.11.  Although Brush does not refer to the Ohio Commercial Code in its Summary Judgment briefs, it appears to contend that the Indemnification Certificates were

Pursuant to the Indemnification Certificates, Pentron agreed to indemnify Brush "against any demands, claims, lawsuits, liability, damage, judgment, expense or loss . . . relating in any way to beryllium . . . which [Brush] may incur or become subject to by reason of its sale, supply or shipment of beryllium-containing products to [Pentron]."  (Brush Am. Compl. Exs. B-F). Brush lays heavy emphasis on the first half of this undertaking, stressing that the Certificates apply to "any" claims relating in "any" way to beryllium.  (Brush Mot. Summ. J. at 1, 16-17).  In order to demand complete indemnification in the underlying cases, however, Brush must excise the Certificates' crucial limiting phrase, "by reason of its sale, supply, or shipment of beryllium-containing products to [Pentron]."  This language prevents Brush from recovering for losses incurred by reason of something *other* than sales of beryllium to Pentron—such as losses incurred by reason of sales to third parties or losses incurred by reason of its own intentional torts.  Brush nevertheless demands complete indemnification for just such costs.

Brush has offered no evidence to show how much, if any, of its claimed indemnifiable costs were actually incurred "by reason of its sale" of beryllium to Pentron.  Indeed, Brush has shown little more than that it and Pentron have been named codefendants in the underlying cases. In *Hill*, at least some portion of Brush's costs *must* be attributed to the plaintiff's allegation that Brush committed intentional torts.  (Brush Am. Compl. Ex. I ¶¶ 39-47).  These costs were not incurred "by reason of" Brush's sale of beryllium to Pentron, and are not compensable under the Certificates.  Similarly, in *Hill* and *Blackstock*, at least some portion of Brush's costs—and most likely all of them—*must* be attributed to the plaintiffs' allegations that they were exposed to beryllium that Brush sold to Pentron's competitor, Jensen.  (Brush Am. Compl. Ex I ¶¶ 6-7, Ex. J

---

integral components of sales agreements between the parties, and thus subject to both Articles One and Two of the Commercial Code.  (Brush Am. Compl. ¶¶ 9, 13).

¶¶ 9-12).  These costs are not compensable under the Certificates, because they are not fairly traceable to a sale of Brush beryllium to Pentron.  Only by ignoring the contracts' limiting language can Brush claim a right to compensation for all of its costs in the underlying cases. Brush's selective amputation of the Certificates is without justification in law or fact, and must be rejected.

> 3.    Brush's interpretation of the Certificates is inconsistent with the parties' consistent course of dealing as reflected by the circumstances surrounding the execution of the five separate Certificates.

In addition to offending the plain language of the Certificates, Brush's interpretation is inconsistent with the parties' execution of multiple Certificates, and is thus contrary to the law of Ohio.  Section 1301.11 of the Ohio Commercial Code provides that "[t]he express terms of an agreement and an applicable course of dealing . . . shall be construed wherever reasonable as consistent with each other."[9]  OHIO REV. CODE ANN. § 1301.11(D).  In this case, Pentron's interpretation of the Certificates harmonizes the language of the contracts with the parties' execution of multiple Certificates, while Brush's interpretation ignores the parties' course of dealing altogether.

Between 1989 and 1993, Brush required Pentron to execute a separate Indemnification Certificate each time the parties agreed to a sale of beryllium for the following year.  (Brush Mot. Summ. J. at 3; Ex. B ¶ 21, Prasad Aff.).  Pentron accordingly signed one Indemnification Certificate for each of the yearly sales between 1990 and 1993, and one more Indemnification

---

[9] The statute further defines "course of dealing" to mean "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."  OHIO REV. CODE ANN. § 1301.11(A).  The official commentary makes clear that "the meaning of the agreement of the parties is to be determined by the language used by them and by their action,

Certificate for the sale covering the two-year period of 1994 and 1995.  (Brush Am. Compl. Exs. B-F; Ex. B ¶¶ 16-21, Prasad Aff.).  The parties' repeated execution of identical Certificates in connection with each discrete sale of Beryllium plainly reflected the parties' shared understanding that each Certificate applied only to the specific sale in connection with which it was executed.  Brush's interpretation, which accords each Certificate unlimited application to all of Brush's sales to Pentron, whenever occurring, reduces the parties' execution of multiple Certificates to a meaningless annual exercise in redundancy.  Were Brush's interpretation to be the correct one, there would have been no need for any Certificate other than the single document signed in October 1989.

Brush's interpretation is also inconsistent with its own affirmative representations at the time of the sales.  Order receipts and packing lists that Brush sent to Pentron along with purchased beryllium explicitly state that specific signed Indemnification Certificates apply to specific quantities of shipped beryllium.  (Exs. A-7, 8. Kaufman Aff. (Packing Slip, Invoice)).  Consistent with a sale-specific interpretation of the Certificates, Brush's Contract Administrator informed Pentron on October 26, 1992, that "as in the past a new Indemnification Certificate [would be] required" in connection with Pentron's 1993 purchase of 600 pounds of beryllium.  (Ex. A-9 Kaufman Aff. (Oct. 26, 1992 Letter from Mullin to Prasad)).  Moreover, contemporaneous correspondence between Brush and Pentron manifested the parties' shared expectation that Brush would be entitled to compensation for, at most, some allocated fraction of its legal fees, and not to complete and automatic indemnity for all of its costs.  (Ex. A-10 Kaufman Aff. (Nov. 6, 1992 Letter from Chomich to Prasad)).  These and similar representations

---

read and interpreted in the light of commercial practices and other surrounding circumstances." *Id.* cmt. 1.

indicate that Brush shared Pentron's understanding that each Certificate would apply only to the discrete future sale of beryllium in connection with which it was executed.

Read in light of the parties' execution of separate, identical Certificates each time Pentron purchased beryllium between 1990 and 1995, as well as its contemporaneous written and oral representations, it is clear that the phrase "by reason of its sale" requires Brush to demonstrate that its losses were incurred by reason of a sale of beryllium to which an Indemnification Certificate applied. By tying Brush's right to indemnity to losses actually attributable to a sale of beryllium to which an Indemnification Certificate applied, the quoted language limits Pentron's contractual obligation to that of an indemnitor, rather than a general liability insurer. *Cf. Chi. & Nw. Transp. Co. v. Emmet Fertilizer & Grain Co.*, 852 F.2d 358, 360 (8th Cir. 1988) (refusing to give indemnitee the benefit of "license terms which it should have known would have been unacceptable to the indemnitor at the time of negotiation") (citing Restatement (Second) of Contracts § 211(3)).

In contrast to Pentron's reasonable interpretation, Brush ambitiously interprets the phrase "by reason of its sale" to mean "by reason of any and all sales, whenever occurring, to Pentron and any third parties." (Am. Compl. ¶ 12; Brush Mot. Summ. J. at 16). Having thus relieved itself of the burden of showing that its costs were in fact caused by sales of beryllium to which an Indemnification Certificate applies, Brush is able to claim an unlimited right to compensation for any and all of the costs it has incurred in the underlying cases, despite the fact that some substantial portion of these losses cannot possibly have been incurred by reason of a sale of beryllium to Pentron to which an Indemnification Certificate applied. (*Id.*).

The Court should deny Brush's motion for summary judgment for the simple reason that it is contrary to the parties' shared intent as objectively manifested in the parties' course of

dealing and Brush's own contemporaneous representations.  The Court should grant Pentron's

motion for partial summary judgment because Pentron's interpretation gives full and proper

effect to the parties' shared intent as revealed by their contemporaneous dealings.

> 4.    Brush's "retroactive" interpretation of the Indemnification Certificates is
> contrary to well-established canons of contractual interpretation as
> consistently applied by courts that have addressed the issue.

Brush's demand for complete indemnification in *Millangue*, *Simon*, and *Blackstock*

necessarily involves application of the Indemnification Certificates to beryllium sales and

exposures that occurred prior to the execution of the first Indemnification Certificate.  Not

surprisingly, Brush's ambitious attempt to apply the Certificates retroactively is unsupported by

the law.

State and federal courts have consistently held that a contract of indemnity will not be

interpreted to apply retroactively in the absence of language that "plainly manifests an intention

not to be limited to future losses or liabilities, but to cover past transactions and existing losses or

liabilities."  *See* 42 C.J.S. Indemnity § 13.  The Eighth Circuit Court of Appeals, for instance,

held that an indemnification agreement between two commercial parties would not be interpreted

to apply to events which occurred prior to the execution of the agreement in the absence of

explicit language of retroactivity.  *See Chi. & Nw. Transp. Co.*, 852 F.2d at 360.  Under the

contract at issue, the defendant had agreed to indemnify the plaintiff "from any and all . . .

liability for any injury or death of any person" resulting from use of a fertilizer unloader

manufactured by the defendant.  *Id.* at 359.  Despite this broad language of indemnification, the

court held that the defendant was not obligated to indemnify the plaintiff for liability resulting

from injuries sustained prior to the execution of the agreement.  *Id.* at 360.  The court

emphasized that retroactive application of the contract would offend "common fairness," and

refused to give the indemnitee the benefit of "license terms which it should have known would

have been unacceptable to the indemnitor at the time of negotiation." *Id.* (citing Restatement (Second) of Contracts § 211(3)).  Other courts have reached the same conclusion when presented with contracts purporting to extend indemnification to "any" or "all" subsequent claims.  *See Bunker Ramo-Eltra Corp. v. Fairchild Indus., Inc.*, 639 F. Supp. 409, 419 (D. Md. 1986); *Miele v. Equitable Life Assurance Co.*, 99 Civ. 11048 (KNF), 2002 U.S. Dist. LEXIS 5284, at *17-18 (S.D.N.Y. Mar. 29, 2002) (Ex. J).[10]

These holdings are consistent with the decision in *Prim Secs. Inc. v. McCarthy*, No. 05-CV-783, 2006 U.S. Dist LEXIS 55754 *13-14 (N.D. Ohio Aug. 10, 2006) (Gaughan, J.) (Ex. K).  In *Prim*, the Court refused to apply the indemnity clause of an employment contract to a failed investment transaction that occurred prior to the date on which the contract was executed.  *Id.* Although the indemnity clause of the contract at issue in *Prim* was "silent as to its retroactive effect," the Court concluded that retroactive application of the indemnity clause would be inconsistent with the "overarching purpose" of the contract.  *Id.* at 14.  The same is true here.  In this case, the parties' repeated execution of identical contracts over a period of five years amply demonstrates that the parties' shared purpose was to apply the Certificates prospectively only, and only to the specific sales of beryllium in connection with which they were executed.

Where the courts have found indemnity agreements to apply retroactively, they have done so because the terms of the agreements explicitly and unambiguously extended indemnification to past events or transactions.  *See, e.g., Gulf States Airgas, Inc. v. Am. Marine Constr., Inc.*, No. 98-0821 Section "N", 1999 U.S. Dist. LEXIS 1628, at *8 (N.D. La. Feb. 11, 1999) (Ex. L);

---

[10] *See also Paredes v. Hilton Int'l*, 896 F. Supp. 223, 230 (D.P.R. 1995); *United States v. Cont. Cas. Co.*, 49 F. Supp. 717, 720 (D. Md. 1943); *Evans v. Howard R. Green Co.*, 231 N.W.2d 907, 910 (Iowa 1975); *Nunnery v. Baker*, 195 So. 314, 316 (Miss. 1940); *Temmel v. 1515 Broadway Assocs., L.P.*, 795 N.Y.S.2d 234 (N.Y. App. Div. 2005).

*Hawkins Constr. Co. v. First Fed. Sav. & Loan Ass'n*, 416 F. Supp. 388, 396 (S.D. Iowa 1976); *Am. Cyanamid Co. v. Ring*, 286 S.E.2d 1, 3 (Ga. 1982); *Podhaskie v. Seventh Chelsea Assocs.*, 770 N.Y.S.2d 332, 335 (N.Y. App. Div. 2005). These decisions stand for the uncontroversial proposition that parties to an indemnification agreement may expressly provide for retroactive application of an indemnity agreement, *see generally* 42 C.J.S. Indemnity § 9, and are entirely consistent both with the cases discussed above and with the widely accepted doctrine precluding retroactive application in the absence of such explicit language.

Nothing in the language of the Indemnification Certificates contested here "plainly manifests" the parties' intent to apply the Certificates to events and transactions that occurred prior to their execution. Familiar canons of contractual interpretation, as consistently applied by courts throughout the country when presented with the issue, preclude a finding that the Certificates apply to beryllium sales or exposures that occurred prior to 1990, when Brush sold the first lots of covered beryllium to Pentron.

B. Unresolved Issues of Material Fact Preclude Summary Judgment in Brush's Favor on the Issue of Damages.

Brush's motion for summary judgment on the issue of damages must fail along with its incorrect interpretation of the Certificates. *See* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2730.1 (3d ed. 1998) ("When the measure of damages in a suit on a contract is subject to the interpretation of the agreement, summary judgment . . . will be denied."). Only by claiming an automatic and unlimited right to indemnification for all the costs it has incurred in the *Millangue*, *Simon*, *Hill*, and *Blackstock* suits can Brush possibly argue that its damages are ripe for summary adjudication. (Brush Mot. Summ. J. Ex. C). As discussed above, Brush simply is not entitled to recover all costs arising out of any suit that relates in any way, however marginal, to beryllium that it sold to Pentron at any time, and Brush cannot satisfy

21

its burden under the Certificates merely by tallying its legal bills.  Rather, Brush must prove which of its costs were in fact the result of its sale to Pentron of contractually covered quantities of beryllium.  To date, Brush has presented no evidence tending to show which portion of its costs are compensable under the Certificates, and Brush's claimed entitlement to 100 percent of its costs cannot withstand proper interpretation of the Certificates.  Unresolved issues of material fact thus preclude summary judgment in Brush's favor on the issue of damages.

At least one Ohio court has denied summary judgment where, as here, the indemnitee offered insufficient evidence of its damages.  *See Buckeye Union Ins. Co. v. Rex Reliable Heating & Air Conditioning*, No. 1995 CA 00131, 1996 Ohio App. LEXIS 742 (Stark Co. Ct. App. Feb. 12, 1996) (Ex. M).  In *Buckeye*, the Court of Appeals denied summary judgment on the issue of damages because the amount of any damages was an issue on which the plaintiff bore the burden at trial:

> Before a party may enforce an indemnification agreement, that party must prove both that it has actually incurred damages and the amount of said damages.  *See Reynolds v. Physicians Ins. Co. of Ohio* (1993), 68 Ohio St. 3d 14, 623 N.E.2d 30 (stating an indemnitee may recoup loss for entire amount of *damages paid*).  Upon careful examination of the record, we find Ogenco has failed to produce evidence with regard to the damages it has allegedly suffered, an issue for which Ogenco bears the burden of production at trial.  Although the record contains Ogenco's "Amendment to Prayer" which claims its damages are $12,494.75, this document is merely a pleading and does not constitute evidentiary material sufficient to withstand summary judgment under [*Celotex v. Catrett*, 477 U.S. 317 (1986)] and [*Wing v. Anchor Media Ltd.*, 570 N.E.2d 1095 (Ohio 1991)].

*Id.* at *7.  As in *Buckeye*, Brush has provided scant evidence of its damages.  The affidavit of Brush's in-house counsel, consisting of no more than a lump sum tally of its attorneys' fees in the underlying cases, is insufficient evidence of the damages Brush alleges it suffered by reason of sales of beryllium to Pentron to which an Indemnification Certificate applied.  The Court should therefore deny Brush's motion for summary judgment on the issue of damages.

C.    As Interpreted by Brush, the Contracts Are Unconscionable.

Brush's misinterpretation of the Certificates transforms Pentron from a limited indemnitor into a general liability insurer for Brush's beryllium business.  This interpretation is not only wrong, it is unconscionable.

Ohio courts will not enforce an unconscionable contract.  Section 1302.15 of the Ohio Code provides:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

OHIO REV. CODE ANN. § 1302.15.  The basic test for unconscionability is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the challenged clauses are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.  *See id.* cmt. 1; *Evans v. Graham Ford, Inc.*, 442 N.E.2d 777, 781 (Ohio Ct. App. 1981).  An Ohio court will refuse to enforce a contract if it finds (1) that there was an absence of meaningful choice on the part of one of the parties and (2) that the contract terms are unreasonably favorable to the other party.  *See Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 189 (Ohio 1993); *Collins v. Click Camera & Video, Inc.*, 621 N.E.2d 1294, 1299 (Ohio Ct. App. 1993).  It is sometimes said that this conjunctive test for unconscionability requires proof of both "procedural" and "substantive" unconscionability.  *See Collins*, 621 N.E.2d at 1299.

These general principles apply equally to commercial contracts between corporate parties, notwithstanding Brush's wholly insupportable announcement of a new *per se* rule of Ohio contract law.  (Brush Resp. to Pentron's Mot. to Withdraw, Docket No. 58) ("*[A]s a matter of law*, the defense of unconscionability does not apply to commercial contracts like those between Pentron and Brush." (emphasis in original)).  The Supreme Court of Ohio has explicitly

23

recognized that "'a commercial purchaser is not doomed to failure in pressing an unconscionability claim.'"  *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 639 (Ohio 1989) (quoting *Salt River Project v. Westinghouse Elec. Corp.*, 694 P.2d 198 (Ariz. 1984)).  Although findings of unconscionability in commercial settings are concededly rare, they are hardly without precedent.  *See, e.g.*, *Constr. Assocs. v. Fargo Water Equip. Co.*, 446 N.W.2d 237 (N.D. 1989); *Discount Fabric House of Racine, Inc. v. Wis. Tel. Co.*, 345 N.W.2d 417 (Wis. 1984); *Pittsfield Weaving Co. v. Grove Textiles, Inc.*, 430 A.2d 638 (N.H. 1981); *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473 (Cal. Ct. App. 1982); *Allen v. Mich. Bell Tel. Co.*, 171 N.W.2d 689 (Mich. Ct. App. 1969).

As expansively interpreted by Brush, the Indemnification Certificates at issue in this case present a genuine case of commercial unconscionability for two reasons.  First, Pentron had no meaningful choice but to sign the Certificates.  Second, the terms of the Certificates, as interpreted by Brush, are unreasonably favorable to Brush and oppressive to Pentron.

       1.    The Certificates are procedurally unconscionable because Pentron had no meaningful choice but to sign them.

The Ohio courts have identified a number of considerations relevant to determining whether a contract is procedurally unconscionable.  Among these are:  (1) the relative bargaining power of the parties; (2) whether there were alternative sources of supply for the goods in question; (3) which party drafted the contract and whether the terms were explained to the other party; and (4) whether alterations in the printed terms were possible.  *See Collins*, 621 N.E.2d at 1299 (citing *Johnson v. Mobil Oil Corp.*, 415 F. Supp. 264, 268 (E.D. Mich. 1976)).  These factors support Pentron's contention that the Certificates are procedurally unconscionable.

The first two factors of unconscionability analysis—relative bargaining power and alternative supply—weigh decisively in Pentron's favor.  At the time the parties executed the

contested Certificates, Pentron's signature product was Rexillium, a dental composite which required a steady supply of pure beryllium for its manufacture.  (Ex. B ¶¶  7, 12, Prasad Aff.). Brush now admits that "[d]uring the years 1980-1993, Brush Wellman was the sole fully integrated source of pure beryllium from which Jeneric Pentron could purchase pure beryllium." (Stipulation).  In fact, at all times relevant to this case, Brush owned and operated the only beryllium-producing mine in the United States. (Ex. D at 33, Ryczek Dep.; Ex. E at 43, Mylander Dep.; Ex. A-3 at 2, Kaufman Aff. ("Beryllium Copper")).  Prior to the relaxation of import restrictions on products from the former Soviet Union in the early 1990s, Brush was the sole source of pure beryllium available for purchase in the United States.  (Ex. E at 30-31, Mylander Dep.; Ex. B ¶ 13, Prasad Aff.).  Brush even boasted in its own advertising materials that it was "the only source of beryllium metal and beryllium oxide powder in the Western World."  (Ex. A-4 at 2 Kaufman Aff. ("Producing Defect Free Beryllium and Beryllium Oxide")).  As other courts have recognized, this sort of monopoly control by one party of goods or services that the other party requires undermines the very notion of freedom of contract, and is strong evidence of procedural unconscionability:

> Implicit in the principle of freedom of contract is the concept that at the time of contracting each party has a realistic alternative to acceptance of the terms offered.  Where goods and services can only be obtained from one source . . . the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without.  Depending on the nature of the goods or services and the purchaser's needs, doing without may or may not be a realistic alternative. Where it is not, one who successfully exacts agreement to an unreasonable term cannot insist on the courts enforcing it on the ground that it was freely entered into, when it was not.

*Allen*, 171 N.W.2d at 692. For Pentron, "doing without" a vital component of its signature

product was not a "realistic alternative."[11] Brush's monopoly control thus constitutes strong

evidence of the procedural unconscionability of the contested Certificates.

The third factor of the unconscionability analysis—which party drafted the contract and

whether the terms of the contract were explained to the other party—also supports Pentron's

position. On their face, the Certificates appear to be preprinted form contracts into which

different customers' names could be "plugged." (Brush Am. Compl. Exs. B-F; Ex. B ¶ 23 Prasad

Aff.). Of greater interest are the affirmative representations Brush made in connection with the

contracts. As discussed above, Brush repeatedly stated on its sales and packing slips that specific

Certificates applied to specific quantities of shipped beryllium. (Ex. A-7, 8, Kaufman Aff.

(packing list, invoice)). These statements confirmed Pentron's reasonable, and correct,

interpretation of the Certificates, and led Pentron to believe that it would be liable only for costs

---

[11] Brush argues in its motion for summary judgment that Pentron could have used scrap beryllium, master alloy, or Russian beryllium to manufacture Rexillium. (Brush Mot. Summ. J. at 5, 11-12). Pentron disputes every one of these factual allegations: (1) Pentron has consistently maintained that scrap beryllium was not suitable for its purposes, due to inconsistencies in quality and unpredictability of supply (Ex. B ¶ 12, Prasad Aff.; Ex. C at 47-50, Prasad Dep.); (2) although Pentron did, for a time, use master alloy to manufacture Rexillium, it switched to pure beryllium precisely because it determined that the available master alloy was unsuitable for the manufacture of Rexillium (Ex. B ¶¶ 7-12, Prasad Aff.; Ex. C at 12-19, Prasad Dep.); and (3) Russian beryllium was not available in the United States until the early 1990s (Ex. B ¶¶ 13, 31, Prasad Aff.; Ex. C at 40, 54-55, Prasad Dep.). Once Russian-source pure beryllium became available for purchase in the United States, Pentron diligently investigated its quality, reliability, and general suitability for use in the manufacture of Rexillium. (Ex. B ¶¶ 31-32, Prasad Aff.; Ex. C at 54-58, Prasad Dep.). Once Pentron determined that Russian beryllium was suitable for use in medical applications, Pentron terminated its business relationship with Brush and began purchasing Russian-source pure beryllium at a lower price. (Ex. B ¶ 32, Prasad Aff; Ex. C at 58, 60, Prasad Dep.). The fact that Pentron terminated its relationship with Brush as soon as a competitive supply of beryllium became available supports, rather than undermines, Pentron's argument that it had no meaningful choice but to sign the Indemnification Certificates. If Brush contends that Pentron could have used scrap, master alloy, or Russian beryllium to

actually caused by sales of beryllium to which a Certificate applied.  Brush also made a number of statements suggesting that the Certificates would apply only to suits brought by Pentron's employees,[12] and that Brush would be obligated to assume at least *some* portion of the costs it incurred in suits related to its sale of beryllium.[13]  Taken together, Brush's statements led Pentron to believe it was undertaking a much more limited responsibility than Brush now charges.  Brush's misdescription of the meaning of contract terms that Brush itself drafted is still more powerful evidence of the procedural unconscionability of the Certificates.

The fourth factor in unconscionability analysis—whether changes to the printed form were possible—either weighs in Pentron's favor or is a matter of disputed material fact.  In its Supplemental Motion for Summary Judgment, Brush argues that its recent document production shows that other customers were able to renegotiate the terms of the Indemnification Certificates. (Brush Supp. Mot. Summ. J. at 3-6, Docket No. 74).  Although some of the documents do seem to indicate that other customers were allowed to negotiate the indemnity terms, other record evidence tends to show the opposite.  (Ex. E at 83, Mylander Dep. (stating that no customers were permitted to purchase beryllium without signing the Certificates); Ex. C at 84, Prasad Dep. (stating that Dr. Prasad "was told that [Pentron] could not purchase the goods without signing

---

manufacture Rexillium between 1990 and 1995, these disputed material facts preclude the entry of summary judgment in Brush's favor.

[12]  *See* Ex. A-10, Kaufman Aff. (Nov. 6, 1992 Letter from Chomich to Prasad) ("[T]here could be potential lawsuits filed by workers in your facility who are exposed to levels of beryllium vapors exceeding regulatory requirements."); *Id.* Ex. A-11 (Undated Letter from Brush to "Customer") ("The reason we are requiring this certificate is to make sure our customers recognize the fact that Brush Wellman's liability ends after properly informing the customer of the potential health hazards associated with handling beryllium.  As with any hazardous material in the workplace, it is incumbent upon your managers and supervisors to ensure this knowledge is given to your workers . . . .  Brush Wellman will continue to help you educate your employees on beryllium's toxicity and health hazards . . . .").

[13]  *See* Ex. A-10, Kaufman Aff. (Nov. 6, 1992 Letter from Chomich to Prasad).

[the Certificates]"); Ex. A-12 at 259, Kaufman Aff. (Kolanz Dep. in *Hill v. Brush Wellman Engineered Materials, Inc., et al.*) (Brush's 30(b)(6) witness was "not aware that [the Indemnification Certificates] were modified between customers" and "would be really surprised if they were."); Ex. A-11, Kaufman Aff. (Undated Letter from Brush to "Customer") ("Brush Wellman is *requiring* that *all* purchasers of beryllium powder, beryllium chemicals, beryllium vacuum cast lump and beryllium oxide powders, agree to and sign an indemnification certificate.")).  This issue thus remains a matter of disputed fact.  Moreover, Brush's document production does nothing to establish that *Pentron* would have been permitted to renegotiate the terms of the Certificates that it signed, regardless of what other customers were allowed to do. Finally, even if this single factor is found to weigh in Brush's favor, all of the other tests for unconscionability weigh in Pentron's favor.

In sum, the Certificates are procedurally unconscionable because:  (1) at the time the Certificates were executed, Brush had a monopoly on the supply of beryllium available for purchase in the U.S.; (2) Pentron required a steady supply of pure beryllium in order to manufacture Rexillium, its signature product; (3) Brush drafted the Certificates itself; (4) Brush's statements concerning the meaning of the terms of the Certificates led Pentron reasonably to believe that it was undertaking a more limited responsibility that Brush now charges; and (5) the Certificates were offered on a "take-it-or-leave-it" basis with no opportunity to renegotiate the terms drafted by Brush.

       2.     As interpreted by Brush, the Certificates are substantively unconscionable.

In addition to being procedurally unconscionable, the Certificates, as interpreted by Brush, are substantively unconscionable because they are unreasonably favorable to Brush and oppressive to Pentron.  *See* OHIO REV. CODE ANN. § 1302.15 cmt. 1.  Brush claims an expansive entitlement to damages under the Certificates that exceeds Pentron's combined profits for fiscal

years 2004 and 2005, and which threaten to expose Pentron to financially crippling liabilities indefinitely into the future. (Ex. F ¶ 3, Hulteen Aff.). As discussed above, Brush reaches this astronomical calculation chiefly by charging Pentron with liability for costs attributable to sales and exposures that occurred *prior* to the execution of the Certificates—as in *Millangue*, *Simon,* and *Blackstock*—and compounds this overstatement of its entitlement by failing to discount for that portion of its liability attributable to sales to third parties—as in *Blackstock* and *Hill*—or to its own alleged intentional torts—as in *Hill*. Brush can point, however, to no commensurate benefit, such as a reduction in price, that Pentron received in exchange for undertaking the onerous responsibility of indemnifying Brush indefinitely into the past and future. Indeed, Brush steadily *increased* the price of beryllium during the years it required Pentron to sign the Certificates, explaining that "the indemnification forms you sign protects [sic] Brush Wellman, but we would still have to expend significant legal fees in the event of a lawsuit! This liability is factored into our pricing structure." (Ex. A-10, Kaufman Aff. (Nov. 6, 1992 Letter from Chomich to Prasad)). Put simply, the "'relative benefit of the bargain to the parties'" under the Certificates as interpreted by Brush is so lopsided as to be unconscionable. *Miller v. Household Realty Corp.*, No. 2003-Ohio-3359, 2003 WL 21469782 (Ohio Ct. App. June 26, 2003) (quoting *United States v. Bedford Assocs.,* 657 F.2d 1300, 1312-13 (2d Cir.1981)) (Ex. N).

Given Pentron's lack of meaningful choice in signing the Certificates, Brush's substantively unconscionable interpretation renders the contracts unenforceable. Should the Court adopt Brush's interpretation of the Certificates, Pentron requests complete summary judgment in its favor on the ground that the Certificates are unconscionable and unenforceable as a matter of law. The Court may, of course, avoid this result by rejecting Brush's unconscionable

interpretation of the Certificates.  *See* OHIO REV. CODE ANN. § 1302.15 (court "may so limit the application of any unconscionable clause as to avoid any unconscionable result").

V.      CONCLUSION

For the foregoing reasons, Pentron respectfully requests the Court to grant summary judgment in its favor on the issue of contractual interpretation, and to deny Brush's motion for summary judgment on the issue of damages.  In the alternative, Pentron respectfully requests the Court to grant complete summary judgment in its favor on grounds of unconscionability.

June 4, 2007                                              Respectfully submitted,

                                                         /s/ Arthur M. Kaufman

*Of Counsel:*                                            Arthur M. Kaufman (#0017724)
Michael A. Fitzpatrick                                   Sean M. Ansberry (#0071029)
Cheryl A. Falvey                                         3300 BP Tower
James E. Sherry                                          2000 Public Square
Akin Gump Strauss Hauer & Feld LLP                       Cleveland, OH  44114-2301
1333 New Hampshire Ave. NW                               Telephone:  (216) 621-0150
Washington, DC  20036                                    Facsimile:  (216) 241-2824
Telephone:  (202) 887-4000                               Email:  amkaufman@hahnlaw.com
Facsimile:  (202) 887-4288                                       smansberry@hahnlaw.com

                                                         Attorneys for Jeneric/Pentron, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Motion for Partial Summary Judgment and Motion in the

Alternative for Complete Summary Judgment was electronically filed this 4th day of June, 2007.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/ Arthur M. Kaufman
One of the Attorneys for Jeneric/Pentron, Inc.