IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Brush Wellman Inc., | Civil Action No.  1:03 CV 2305 |
| Plaintiff, | |
| v. | Judge Christopher Boyko |
| Jeneric/Pentron, Inc., et al., | |
| Defendants. | |
| Jeneric/Pentron, Inc., et al., | Civil Action No.  1:04 CV 721 |
| Plaintiff, | |
| v. | Judge Christopher Boyko |
| Brush Wellman Inc. | |
| Defendant. | |

**BRUSH WELLMAN INC.'S AMENDED OPPOSITION TO
JENERIC/PENTRON INC.'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF BRUSH'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

ARGUMENT ........................................................................................................... 4

    I.    Pentron's Interpretation of the Indemnification Certificates is
Contrary to the Plain and Unambiguous Language of the
Certificates ........................................................................................... 4

        A.    The Indemnification Certificates Apply, Without Any Time
Limitation, to All Sales of Beryllium-Containing Products
to Pentron ................................................................................. 4

        B.    There is No Requirement That A Contract Must Expressly
State That It Applies Retroactively ........................................... 6

        C.    The Certificates Do Not Relieve Pentron From Its Duty to
Indemnify Where There Are Other Alleged Beryllium
Suppliers .................................................................................. 8

        D.    The Parties' Course of Dealing Cannot Be Used to Negate
the Plain Language of the Indemnifications Certificates ......................... 11

    II.    The Indemnification Certificates Are Not Unconscionable As a
Matter of Law ...................................................................................... 13

    III.    There is No Genuine Dispute of Material Fact on the Issue of
Damages ............................................................................................. 18

CONCLUSION ...................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ball v. Ohio State Home Servs., Inc.*,
    861 N.E.2d 553 (Ohio Ct. App. 2006) .............................................................. 13

*Beneficial Mtg. Co. of Ohio v. Leach*,
    No. 01AP-737, 2002 WL 926759 (Ohio Ct. App. May 9, 2002) .................................... 13

*Blosser v. Enderlin*,
    148 N.E. 393 (Ohio 1925) ........................................................................ 11

*Bunker Ramo-Eltra Corp. v. Fairchild Indus., Inc.*,
    639 F. Supp. 409 (D. Md. 1986) ................................................................... 7

*Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*,
    537 N.E.2d 624 (Ohio 1989) ..................................................................... 18

*Chicago & North Western Transportation Co. v. Emmet Fertilizer & Grain Co.*,
    852 F.2d 358 (8th Cir. 1988) ...................................................................... 6

*Cleveland Mack Leasing, Ltd. v. Chef's Classics, Inc.*,
    No. 05 MA 59, 2006 WL 459269 (Ohio Ct. App. Feb. 24, 2006) ............................ 17, 18

*Dugan & Meyers Constr. Co., Inc. v. Ohio Dep't of Adm. Servs.*,
    864 N.E.2d 68 (Ohio 2007) ...................................................................... 12

*Evans v. Howard R. Green Co.*,
    231 N.W.2d 907 (Iowa 1975) ...................................................................... 7

*Glaspell v. Ohio Edison Co.*,
    505 N.E.2d 264 (Ohio 1987) ..................................................................... 17

*Handler v. Southerland Custom Builders, Inc.*,
    2006-Ohio-4371, 2006 WL 2441673 (Ohio Ct. App. Aug. 24, 2006) .......................... 16

*Hawkins Constr. Co. v. First Federal. Sav. & Loan Assoc.*,
    416 F. Supp. 388 (S.D. Iowa 1976) ................................................................ 8

*Henry v. A/S Ocean*,
    512 F.2d 401 (2d Cir. 1975) ..................................................................... 13

*Horton v. Harwick Chem. Corp.*,
    653 N.E.2d 1196 (Ohio 1995) ..................................................................... 9

*Kaufman v. BDO Seidman*,
    984 F.2d 182 (6th Cir. 1993) ........................................ 9

*Latina v. Woodpath Dev. Co.*,
    567 N.E.2d 262 (Ohio 1991) ........................................ 11

*Lewis v. Mathes*,
    829 N.E.2d 318 (Ohio Ct. App. 2005) ........................................ 12

*Michigan Millers Mut. Ins. Co. v. Christian*,
    794 N.E.2d 68 (Ohio Ct. App. 2003) ........................................ 10

*Miele v. Equitable Life Assurance Co.*,
    No. 99 Civ. 11048, 2002 WL 484841 (S.D.N.Y. March 29, 2002) ........................ 7

*Nunnery v. Baker*,
    195 So. 314 (Miss. 1940) ........................................ 7

*Ohio, Pennsylvania and West Virginia Coal Co. v. PanEnergy Corp.*,
    120 F.3d 607 (6th Cir. 1997) ........................................ 11

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) ........................................ 8

*Pacific Ins. Co., Ltd. v. Eaton Vance Mgmt.*,
    369 F.3d 584 (1st Cir. 2004) ........................................ 8

*In re Paragon Trade Brands, Inc.*,
    324 B.R. 797 (Bankr. N.D. Ga. 2002) ........................................ 13

*Paredes v. Hilton Int'l*,
    896 F. Supp. 223 (D.P.R. 1995) ........................................ 7

*Porpora v. Gatliff Building Co.*,
    828 N.E.2d 1081 (Ohio Ct. App. 2005) ........................................ 13

*Prim Securities, Inc. v. McCarthy*,
    No. 05-CV-783, 2006 WL 2334836 (N.D. Ohio Aug. 10, 2006) ........................ 6, 7

*Shifrin v. Forest City Enterprises, Inc.*,
    597 N.E.2d 499 (Ohio 1992) ........................................ 5, 11

*Temmel v. 1515 Broadway Assocs., L.P.*,
    795 N.Y.S.2d 234 (N.Y. Ct. App. 2005) ........................................ 7

*United States v. Continental Cas. Co.*,
    49 F. Supp. 717 (D. Md. 1943) ........................................ 7

CLI-1530617v1

*Universal Veneer Mill Corp. v. Buckeye Union Ins. Co.*,
  No. 98AP-20, 1998 WL 807976 (Ohio Ct. App. Nov. 10, 1998) .................................... 10

*Young v. Rollins Leasing Corp.*,
  No. L-78-137, 1979 WL 207397 (Ohio Ct. App. Dec. 7, 1979) ...................................... 18

## STATUTES & RULES

Ohio Rev. Code Ann. § 1301.11 ................................................................................. 11

Md. Code Ann., Cts. & Jud. Proc., § 3-1404 ............................................................. 10

## MISCELLANEOUS

*Black's Law Dictionary* (6th ed.1990) ......................................................................... 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Brush Wellman Inc., | Civil Action No.  1:03 CV 2305 |
| Plaintiff, | |
| v. | Judge Christopher Boyko |
| Jeneric/Pentron, Inc., et al., | |
| Defendants. | |
| Jeneric/Pentron, Inc., et al., | Civil Action No.  1:04 CV 721 |
| Plaintiff, | |
| v. | Judge Christopher Boyko |
| Brush Wellman Inc. | |
| Defendant. | |

**BRUSH WELLMAN INC.'S AMENDED OPPOSITION TO
JENERIC/PENTRON INC.'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF BRUSH'S MOTION FOR SUMMARY JUDGMENT**

Pentron's brief shows that there is no obstacle to summary judgment in Brush's favor.

Pentron tries to avoid that result by asking the Court to rewrite the contract.

Pentron's main argument is that the indemnity certificates should apply only to claims

arising out of "specific sales" made in the year or two after each certificate was signed.  (Pentron

Mem. at 12.)[1]  The problem with this argument is that the plain language of the agreement

---

[1] Pentron's brief is referred to herein as "Pentron Mem."  Brush's memorandum in support of its motion for summary judgment is referred to herein as "Brush Mem."  Brush's supplemental memorandum in support of its motion for summary judgment is referred to herein as "Brush Suppl. Mem."  Unless otherwise noted, the depositions and exhibits cited herein were

contains no such time limitation.  Other customers of Brush, recognizing this, negotiated for exactly the kind of limitation that Pentron would now have the Court graft onto the certificates. But Pentron did not.  The Court's role of course is not to change the contract, but to enforce it. As written, the contract is not limited to "specific sales."

To support its argument for an implied time limit, Pentron claims that there was no reason to require a new certificate each year unless the parties intended to limit the agreement to that year's sales.  (Pentron. Mem. at 17.)  But there was a reason, as described in undisputed testimony:  Brush required Pentron (and others) to sign an annual certificate as a simple condition of continuing to do business with Brush.  Customers seeking to buy pure beryllium were expected to reaffirm their understanding of the risks of using beryllium by signing a new certificate.  The undertakings in the certificate were not expressly or impliedly limited to a specific time period.

Pentron also argues that the Court should graft other limits onto the parties' agreement:  it says that it should not be required to indemnify Brush fully if there are other defendants in the case, or if there are intentional tort claims in the complaint.  But again, there is no basis in the agreement for these limitations.  The certificates are plain:  if Brush "becomes subject to" a claim or lawsuit by reason of its sale, supply, or shipment of beryllium to Pentron, then Pentron must hold Brush harmless and indemnify *against the lawsuit*, not just against some allocable portion of the costs that Brush incurs.

Pentron claims that in two of the cases at issue here, *Hill* and *Blackstock*, there is no evidence that any Brush beryllium was in the Pentron alloy to which plaintiff was allegedly

_____

(continued...)
filed with Brush's Motion for Summary Judgment, dated April 15, 2005 or with Pentron's Motion for Summary Judgment, dated June 4, 2007.

exposed.  That is untrue.  The Second Amended Complaint in *Hill* specifically alleges that plaintiff was exposed to Pentron's Rexillium in 1980-1988, and discovery has confirmed that her employer during that period used Rexillium.  At the time, Brush was Pentron's only source of beryllium.  In *Blackstock*, the plaintiff's alleged exposures occurred during the same period, in 1980-82.  This is a nonissue.

Finally, Pentron argues that the agreements were "unconscionable" because it had no choice but to sign them.  The record establishes that Pentron decided to buy pure beryllium from Brush because it *preferred* to do so, not because it had to.  It had at least four other choices: (1) Pentron could have used – and, for a time, did use – a master nickel-beryllium alloy to make Rexillium.  But it preferred the quality of pure beryllium.  (2) Pentron could have purchased and used pure beryllium scrap – as did other dental alloy makers.  But it preferred the quality of beryllium bought directly from Brush.  (3) Pentron could have decided not to use beryllium at all in its alloys.  (Indeed, that is what its competitor and codefendant Jensen Industries decided to do.)  But it preferred to participate in the market for beryllium-containing alloys.  (4) Finally, Pentron could have negotiated over the terms of the indemnity certificates.  The record is plain that other Brush customers did so; some were successful, obtaining for example through negotiations the same limits on the scope of the indemnity that Pentron now asks this Court to impose by fiat.  But Pentron never even tried.  On the undisputed facts, Pentron's "unconscionability" defense is frivolous.

Pentron's liability is clear.  As to damages, Pentron does not dispute the expenditures documented in the now-dated Affidavit of Theresa Haumann.  Nor does it note that it had every opportunity to scrutinize those expenditures when Brush produced its legal bills from *Blackstock*, *Hill*, *Millangue* and *Simon*.  There is no genuine factual dispute that stands in the way of

summary judgment, but only the same underlying legal dispute about the scope of Pentron's

obligations and the same request from Pentron that the Court, somehow, relieve it of at least part

of a bargain it does not like.[2]

## ARGUMENT

**I.     Pentron's Interpretation of the Indemnification Certificates is Contrary to the Plain and Unambiguous Language of the Certificates.**

**A.     The Indemnification Certificates Apply, Without Any Time Limitation, to All Sales of Beryllium-Containing Products to Pentron.**

Pentron argues that the Indemnification Certificates "apply only to losses incurred by

reason of specific sales of beryllium that Brush made to Pentron between 1990 and 1995."

(Pentron Mem. at 12.)  But that limitation does not appear in the plain language of the

Certificates.

The Certificates state that:

> [Pentron] agrees to indemnify and hold harmless [Brush] . . . against any demands, claims, lawsuits, liability, damage, judgment, expense or loss (including legal fees, expenses and costs) relating in any way to beryllium . . . which [Brush] may incur or become subject to by reason of its sale, supply or shipment of beryllium-containing products to [Pentron], including, without limitation any claims or lawsuits by employees of [Pentron], by any customer of [Pentron], or by any other third party.

(Prasad Dep., Exs. 9-10, 14-15, 17.)  This does not limit Pentron's indemnification duty to any

"specific sale" of beryllium-containing products to Pentron.  To the contrary, the contract

unambiguously states that Pentron agrees to indemnify Brush for *any* claims relating in *any* way

---

[2]     Brush is supplementing the record to bring up-to-date the evidence of its damages through another affidavit of Theresa Haumann, filed on under seal on June 28, 2007 pursuant to the Stipulated Protective Order dated October 20, 2005.

to beryllium arising out of Brush's supplier relationship with Pentron.  No other interpretation is reasonable or possible.[3]

Many of Brush's other customers, recognizing that the plain language of the Certificates applies to all past and future beryllium sales, sought to modify that language.  Spex Company, for instance, negotiated a modified Indemnification Certificate providing that Spex's obligation to indemnify Brush would "only be applicable to and have legal effect with regard to transactions between [Brush] and [Spex] occurring on or after the date" of the Certificate.  (*See* Ryczek Aff. ¶ 14 & Ex. 20.)  Likewise, Aldrich Chemical Company negotiated indemnification agreements with Brush that were only effective for two-year terms.  (*Id.* ¶ 4 & Exs. 4, 5.)  Clearly, these customers recognized that Brush's proposed Indemnification Certificate was not limited to any specific beryllium sales.

Pentron likewise could have sought a modification that limited its indemnification obligation to certain specific sales of beryllium.  But, unlike other customers, it never even attempted to do this.  (Prasad Dep. at 92-93.)  Pentron cannot now ask the Court to make the modifications that Pentron wishes it had made long ago.  *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992) ("When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.").

---

[3]  Moreover, any assertion by Pentron that the language of the Indemnification Certificates should be strictly construed against Brush is simply incorrect.  As Brush pointed out in its opening memorandum, the Ohio Supreme Court has held that this general rule of construction does not apply when the parties to the contract are sophisticated business entities, as they are here.  (Brush Mem. at 18.)

**B.  There is No Requirement That A Contract Must Expressly State That It Applies Retroactively.**

Pentron argues that Brush cannot seek indemnification from Pentron with respect to beryllium sales that occurred prior to the execution of the Indemnification Certificates because there is a general rule that such contracts are only prospective unless they say explicitly that they are retroactive.  (Pentron Mem. at 19-21.)  There is no such rule.

Pentron relies, for example, on *Chicago & North Western Transportation Co. v. Emmet Fertilizer & Grain Co.*, 852 F.2d 358, 359 (8th Cir. 1988).  The parties in that case executed an indemnity contract three years after the defendant's employee suffered injuries while working at plaintiff's site, and six months after the employee had brought suit against plaintiff.  Plaintiff then sought indemnification from defendant with respect to defendant's employee's injury.  In declining to hold that the indemnity contract applied to the earlier injury, the court did not rely on any rule requiring an express statement of retroactivity.  The court simply found on these facts that if defendant had known that plaintiff intended to seek indemnification for an accident that occurred three years earlier and a lawsuit filed six months earlier, it never would have agreed to the terms of the indemnity.  *Id.* at 360 ("As a matter of common fairness, we decline to give [plaintiff] the benefit of ambiguous language where it relies on an undeclared interpretation of the license terms which it should have known would have been unacceptable to [defendant] at the time of negotiation.").  The facts are, of course, very different here.  There was no pending litigation when the Certificates were signed, and no "undeclared interpretation" that Pentron could not foresee.  (Other customers of Brush did foresee it.)

Similarly, in *Prim Securities, Inc. v. McCarthy*, No. 05-CV-783, 2006 WL 2334836, at *4 (N.D. Ohio Aug. 10, 2006), the court refused to apply an indemnity contract to events that "all occurred prior to the date that McCarthy and Prim executed the Agreement."  Again, this

holding was not based on the supposed rule articulated by Pentron.  Rather, the decision was based on the court's finding that, taken as a whole, "[t]he Agreement *clearly states* that its provisions are forward-looking."  *Id.* (emphasis added).  In other words, the court concluded that the parties had expressly agreed to apply the indemnity contract prospectively.  That obviously is not true here.[4]

The cases cited by Pentron stand solely for two propositions, neither of which applies here.  First, an indemnity contract cannot cover losses or injuries that have already occurred at the time the contract is executed, unless the contract says otherwise.  Second, an indemnity contract may not be applied retroactively when its terms expressly state that it will be applied prospectively.  But here, all of the underlying injuries occurred, and all of the underlying lawsuits were filed, long after Pentron signed the Indemnification Certificates.  Thus, Brush had not yet incurred any of the underlying liabilities at the time the indemnification agreements were signed.  It would not be unfair here to hold Pentron to the terms of the Certificates where Pentron

_____

[4]     All of the remaining cases string-cited by Pentron in support of its argument also are inapposite.  *See Bunker Ramo-Eltra Corp. v. Fairchild Indus., Inc.*, 639 F. Supp. 409, 419 (D. Md. 1986) (refusing to apply indemnity contract retroactively because the contract expressly stated that "'Allied shall provide no indemnification hereunder with respect to any conduct or action of defendants prior to the date hereof'"); *Miele v. Equitable Life Assurance Co.*, No. 99 Civ. 11048, 2002 WL 484841, at *5 (S.D.N.Y. March 29, 2002) (refusing to apply indemnity contract retroactively to an accident that had already occurred and was known to both parties at the time the contract was executed); *Paredes v. Hilton Int'l*, 896 F. Supp. 223, 231 (D.P.R. 1995) (refusing to apply indemnity contract retroactively to a loss that had already occurred and was the subject of a lawsuit at the time the contract was executed); *United States v. Continental Cas. Co.*, 49 F. Supp. 717, 719-20 (D. Md. 1943) (refusing to apply the indemnity clause of a bond to cover a  loss that had already occurred at the time the bond was issued); *Evans v. Howard R. Green Co.*, 231 N.W.2d 907, 916-17 (Iowa 1975) (holding that an indemnity contract covers only losses or liabilities incurred after its execution); *Nunnery v. Baker*, 195 So. 314, 316 (Miss. 1940) ("a bond covers only personal injury and property damages sustained after its execution unless it plainly appears from the bond or other competent evidence that it was intended also to cover past personal injuries and property damage"); *Temmel v. 1515 Broadway Assocs., L.P.*, 795 N.Y.S.2d 234, 235 (N.Y. Ct. App. 2005) (refusing to apply an indemnification contract to an accident that occurred more than one month before its execution).

unambiguously agreed to indemnify Brush for any future claims or lawsuits relating in any way to beryllium.

Moreover, courts have held that an indemnity contract *may* be applied retroactively, regardless of whether retroactivity is explicitly provided for, where the provisions of the contract "manifest the parties' intention" to "indemnify for any past" actions. *Hawkins Constr. Co. v. First Federal. Sav. & Loan Assoc.*, 416 F. Supp. 388, 398 (S.D. Iowa 1976). That is exactly the case here. As discussed above, the Indemnification Certificates unambiguously provide that Pentron would indemnify Brush for any claims relating in any way to beryllium by reason of Brush's supplier relationship with Pentron. *See supra* pp. 4-5. That obligation clearly covered all past and future sales of beryllium to Pentron. Indeed, as noted above, other Brush customers recognized this and modified the Certificates accordingly. Pentron cannot now be heard to claim that the Certificates mean the exact opposite of what they say.

    **C.    The Certificates Do Not Relieve Pentron From Its Duty to Indemnify Where There Are Other Alleged Beryllium Suppliers.**

Pentron also asserts that the "by reason of . . ." language in the Indemnification Certificates "prevents Brush from recovering for losses incurred by reason of something *other* than sales of beryllium to Pentron – such as losses incurred by reason of sales to third parties or losses incurred by reason of its own intentional torts." (Pentron Mem. at 15.) Pentron's interpretation of the phrase "by reason of" is incorrect as a matter of law. Courts have long held that the words "by reason of" are words of causation. *See, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 626 (1999) ("We have previously interpreted the phrase 'by reason of' as requiring proximate causation."); *Pacific Ins. Co., Ltd. v. Eaton Vance Mgmt.*, 369 F.3d 584, 589 (1st Cir. 2004) ("[W]e consider the language [of the contract] unambiguous: 'by reason of' means 'because of,' *Black's Law Dictionary* 201 (6th ed.1990), and thus necessitates an analysis at least

approximating a 'but-for' causation test."); *Kaufman v. BDO Seidman*, 984 F.2d 182, 185 (6th Cir. 1993) ("The 'by reason of' language imposes a causation requirement for recovery of damages.").  That causation requirement is satisfied here.

A plaintiff alleging exposure to the products of multiple defendants need only prove that exposure to each product was "a substantial factor in causing his injury."  *Horton v. Harwick Chem. Corp.*, 653 N.E.2d 1196, 1202 (Ohio 1995).  Here, plaintiffs in all four underlying cases clearly allege that exposure to the beryllium that Brush sold to Pentron was a substantial factor in causing their harm:

- Plaintiff in *Millangue* alleged that Mr. Millangue was injured by exposure from 1981 to 2001 to dental alloys manufactured by Pentron from beryllium supplied by Brush.  (Brush Mem. at 17.)

- Plaintiff in *Simon* alleged that she was injured by exposure between 1985 and 1995 to dental alloys manufactured by Pentron from beryllium supplied by Brush. (Brush Mem. at 17.)

- Plaintiff in *Blackstock* alleged that he was injured by exposure between 1980 and 2003 to Pentron's beryllium-containing alloy and to the beryllium-containing alloy of another manufacturer.  (*Blackstock* Compl. ¶¶ 8, 9, 13, attached as Exhibit 1 to the accompanying Supplemental Affidavit of Jeffery D. Ubersax.)  Pentron insists that its only sales of Rexillium to Mr. Blackstock's employer occurred between 1981 and 1982, and that there is no evidence that such Rexillium contained Brush's beryllium at that time.  (Pentron Mem. at 9.)  That is simply wrong.  To begin with, Pentron testified that it obtained beryllium from Brush beginning in 1981. (Prasad Dep. at 39.)  In any event, the record shows that from the late 1970s to the 1990s, Pentron had only two suppliers of beryllium – first it used a master beryllium alloy from Kawecki Berylco, and then it switched to pure beryllium from Brush.  (*Id.* at 9, 12, 15.)  Pentron knew, however, that the beryllium that Kawecki Berylco used for its master alloy had been supplied by Brush.  (*Id.* at 40.)  Thus, the Rexillium that Pentron sold to Mr. Blackstock's lab, even if it included Kawecki Berylco's master alloy, clearly contained Brush's beryllium.

- Pentron claims that, in *Hill*, the beryllium-containing alloys that it sold to Ms. Hill's employer Roy-L Labs did not contain any beryllium supplied by Brush. (Pentron Mem. at 7-8.)  But that argument ignores altogether Ms. Hill's Second Amended Complaint, which alleges that she was exposed to Pentron's beryllium-containing alloy not only at Roy-L Labs from 1992 to 2004, but also at Saylors Dental Lab in Virginia from 1980 to 1988.  (*Hill* Second Am. Compl. ¶ 1, Suppl.

Ubersax Aff., Ex. 2.)  Ms. Hill clearly alleges that while working at Saylors
Dental Lab, she was exposed to Pentron's dental alloy containing beryllium
supplied by Brush (*id.* ¶¶ 1, 6, 7, 10), and discovery has confirmed that Saylors
bought and used Rexillium.  (Saylors Dep. at 22-31 & Ex. 1, Suppl. Ubersax Aff.,
Ex. 3.)

Accordingly, in each of the four underlying cases, plaintiffs allege that they were exposed
to beryllium that Brush supplied to Pentron.  Unquestionably, therefore, Brush has become
subject to these plaintiffs' claims "by reason of its sale, supply or shipment of beryllium-
containing products to [Pentron]."  The fact that these plaintiffs may be alleging that their
injuries were also caused by other substantial factors is irrelevant.

Moreover, there is nothing unfair or improper about requiring Pentron to pay Brush's
losses when other tortfeasors are also alleged to have caused the plaintiff's injuries.  In that
circumstance, Brush has rights of contribution, and by exercising those rights can ensure that it
does not bear a disproportionate share of any adverse judgment.  (Indeed, Brush is actively
pursuing such rights now in the *Hill* case, under the Maryland Uniform Contribution Among
Joint Tortfeasors Act, Md. Code Ann., Cts. & Jud. Proc., § 3-1404, in the wake of separate
settlements by its codefendants Pentron and Jensen Industries.)  As an indemnitor, Pentron is
subrogated to these contribution rights, and therefore will not pay more than a proper share of
any liability to the plaintiff.  *See, e.g.*, *Michigan Millers Mut. Ins. Co. v. Christian*, 794 N.E.2d
68, 79 (Ohio Ct. App. 2003); *Universal Veneer Mill Corp. v. Buckeye Union Ins. Co.*, No. 98AP-
20, 1998 WL 807976, at *5 (Ohio Ct. App. Nov. 10, 1998)  (an "insurer is subrogated to, stands
in the shoes of, the insured, when it pays benefits to the insured and the insured has a claim
against a tortfeasor.  The insurer then may assert all claims against the tortfeasor that the insured
could have asserted.").

Pentron's argument on this issue would make sense if the Indemnification Certificates provided that Pentron must indemnify Brush only where a plaintiff alleges that the *sole* cause of his injury was Brush's sale, supply, or shipment of beryllium to Pentron.  But they do not.

### D.    The Parties' Course of Dealing Cannot Be Used to Negate the Plain Language of the Indemnifications Certificates.

Pentron asks the Court to consider evidence wholly outside the four corners of the Indemnification Certificates regarding Brush and Pentron's "course of dealing" in order to find an intent contrary to the Certificates' plain language.  (Pentron Mem. at 16-18.)   Such a use of extrinsic evidence would be entirely improper.

 "When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Shifrin*, 597 N.E.2d at 501.  Accordingly, "'evidence can not be introduced to show an agreement between the parties materially different from that expressed by clear and unambiguous language of the instrument.'"  *Latina v. Woodpath Dev. Co.*, 567 N.E.2d 262, 264 (Ohio 1991) (quoting *Blosser v. Enderlin*, 148 N.E. 393, Syl. ¶ 2 (Ohio 1925)).[5]

"Contractual language is not rendered ambiguous simply because parties disagree over its meaning."  *Ohio, Pennsylvania and West Virginia Coal Co. v. PanEnergy Corp.*, 120 F.3d 607, 610 (6th Cir. 1997).  Nor does a contract "become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto and a corresponding advantage

---

[5]    This rule is entirely consistent with the Ohio Commercial Code, which Pentron quotes as providing that "[t]he express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other." (Pentron Mem. at 14 (quoting Ohio Rev. Code Ann. § 1301.11(D).)  Pentron neglects, however, to quote the remainder of the provision:  "but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."  Thus, the parties' course of dealing may not be considered where it would conflict with the express terms of the contract.

to the other." *Dugan & Meyers Constr. Co., Inc. v. Ohio Dep't of Adm. Servs.*, 864 N.E.2d 68, 73 (Ohio 2007).  Rather, "[c]ontractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract or if the terms are reasonably susceptible of more than one interpretation." *Lewis v. Mathes*, 829 N.E.2d 318, 323-24 (Ohio Ct. App. 2005).  There is nothing ambiguous about the terms of the Indemnification Certificates.  The terms are clear; Pentron simply does not like those terms and is attempting to avoid them.  Extrinsic evidence therefore may not be considered.

In any event, Pentron's "course of dealing" does not support its interpretation of the contract.  Pentron insists that there was no reason for Brush to require Pentron to execute a new Indemnification Certificate each year, or to note on the sales invoice that a particular Certificate had been signed, unless the parties intended to limit the Certificate to that year's sales.  (Pentron Mem. at 17.)  But Brush had a very good reason to require the yearly Certificates.  The undisputed testimony is that Brush required Pentron and other customers to sign a Certificate with each purchase reaffirming that they understood the health risks associated with beryllium.  (*See* Mylander Dep. at 82-83; Ryczek Dep. at 38-43, 57, 61-62.)  The Indemnification Certificates contained not only an indemnity clause, but also an acknowledgement by the customer that, among other things, it was "fully aware of, and knowledgeable about . . . the health hazards associated with beryllium . . . [and the] need to adequately warn of the health hazards associated with beryllium . . . ."  (Prasad Dep., Exs. 9-10, 14-15, 17.)  Thus, signing a yearly Indemnification Certificate was intended to "reinforce that this information needed to be passed on."  (Ryczek Dep. at 38.)  If a customer refused to sign "this type of indemnification certificate," Brush generally did not make the sale.  (Mylander Dep. at 83; *see also* Ryczek Dep. at 61-62.)

This was the reason for annual Certificates – not any intended time limit on their application.

## II.     The Indemnification Certificates Are Not Unconscionable As a Matter of Law.

Pentron argues that, if the Court accepts Brush's interpretation of the Indemnification Certificates, they cannot be enforced in any event because they are unconscionable.  (Pentron Mem. at 22-30.)  This argument fails because the Indemnification Certificates were not, as a matter of law, procedurally unconscionable.

Pentron recognizes that in order to set aside a contract for unconscionability, the Court must find both "procedural" and "substantive" unconscionability.  (*Id.* at 23.)  "Procedural unconscionability concerns the formation of the agreement and occurs when no voluntary meeting of the minds is possible."  *Porpora v. Gatliff Building Co.*, 828 N.E.2d 1081, 1083 (Ohio Ct. App. 2005).  "[W]hen determining procedural unconscionability, a reviewing court must consider factors bearing directly on the relative bargaining position of the parties," such as "age, education, intelligence, business acumen, experience in similar transactions, whether terms were explained to the weaker party, and who drafted the contract."  *Ball v. Ohio State Home Servs., Inc.*, 861 N.E.2d 553, 556 (Ohio Ct. App. 2006) (internal quotations omitted).[6]  Here,

---

[6]     By contrast, "[s]ubstantive unconscionability refers to the actual terms of the agreement.  Contract terms are unconscionable if they are unfair and commercially unreasonable."  *Porpora*, 828 N.E.2d at 1084.  The test is "whether the terms are so extreme as to appear unconscionable according to the mores and business practices of the time and place."  *Beneficial Mtg. Co. of Ohio v. Leach*, No. 01AP-737, 2002 WL 926759, at *8 (Ohio Ct. App. May 9, 2002) (internal quotations omitted).  There is nothing unfair or unreasonable about an indemnification agreement.  "Courts routinely enforce indemnity contracts as written to uphold the parties' bargain, recognizing that an indemnity provision is an integral element of the parties' determination of how the risks of a transaction should be allocated."  *In re Paragon Trade Brands, Inc.*, 324 B.R. 797, 828 (Bankr. N.D. Ga. 2002); *see also Henry v. A/S Ocean*, 512 F.2d 401, 406 (2d Cir. 1975) ("the doctrine of indemnity serves to allocate risks among those segments of the enterprise best able to minimize the particular risk involved").  Here, Brush was not in a position to control the activities of Pentron or its other customers once its product was out of its hands.  Brush could not force Pentron to pass on adequate warnings to its own

there can be no genuine dispute that Pentron was a sophisticated commercial entity that had the power to bargain with Brush over the Indemnification Certificates, and in any event had a meaningful choice not to sign the Certificates in the form presented by Brush.

*First*, while Pentron might very well be "a family-owned medical supply company" (Pentron Mem. at 2), it is no mom and pop enterprise.  Pentron manufacturers more than 100 different dental alloys, employs more than 200 people, and has annual sales revenue of more than $66 million.  (*See* Brush Mem. at 2.)  It has described itself as "the *leading manufacturer worldwide* for the full spectrum of high quality non-precious alloys for dental application."  (*Id.* (emphasis added).)  Brush – which manufactured just one of the many components in Pentron's products – was far from the only materials supplier that Pentron did business with on a regular basis.  Moreover, the Pentron officer who dealt directly with Brush, Senior Vice President Dr. Arun Prasad, has a Ph.D. in physical metallurgy, began working for Pentron in 1976, and testified that he worked with suppliers other than Brush.  (Prasad Dep. 6-8, 15, 34.)  In short, Pentron was not uneducated, unintelligent, lacking in business acumen, or inexperienced in similar transactions.

*Second*, the undisputed evidence shows that Dr. Prasad frequently bargained with Brush over the terms of its beryllium purchases, including the most important term – price:

> Q. . . . Did you and Brush Wellman negotiate a price for that first purchase [of beryllium] that was somewhat lower than what Brush asked for originally?

---

(continued...)

customers, or to take adequate measures to protect its employees from relevant health risks.  Accordingly, it was not unfair to require that Pentron indemnify Brush for any liability that Brush might incur because of its sales to Pentron.  And there is certainly no evidence in the record suggesting that the terms of the Indemnification Certificates were inconsistent with prevailing mores and business practices at the time they were executed.

A.  I'm sure some negotiations occurred and – for purchasing we had to agree to some sort of negotiated price.

Q.  Okay.  Was it typically the case in your dealings with Brush Wellman that – that Brush would propose a price and you would respond with something lower, and then you would agree somewhere in between?

A.  It's possible.  Sometimes that happened, yes.  Brush came back with a lower offer than what they had started in the negotiation process.

Q.  And then you would come to agreement on that lower price?

A.  Yeah.

(Prasad Dep. at 51-52.)  Pentron's ability to extract price concessions from Brush is not surprising.  As Dr. Prasad himself explained, "we were one of the largest purchaser[s] of pure beryllium from Brush Wellman."  (*Id.* at 64-65.)

Moreover, as described in detail in Brush's Supplemental Memorandum in Support of Its Motion for Summary Judgment, dated May 4, 2007, Brush's other customers – who were similarly situated with Pentron – often negotiated modifications to Brush's proposed Indemnification Certificates.  (Brush Suppl. Mem. at 3-5; Ryczek Aff. ¶¶ 2-14.)  These customers negotiated over nearly every aspect of the Certificates.  Some limited the scope of their indemnification obligation to specific sales, while others limited the duration of their indemnification obligation – they thus sought the same modifications that Pentron now asks the Court to make.  (*See* Brush Suppl. Mem. 3-5.)  By contrast, Pentron never even attempted to negotiate over the Indemnification Certificates, and never told Brush that it did not want to sign them.  (Prasad Dep. at 92-93, 126-127.)  There is no evidence in the record suggesting that Pentron would not have been successful had it simply tried to modify the proposed Certificates.  Indeed, the notion that Pentron had the bargaining power as "one of the largest purchaser[s] of

pure beryllium" from Brush to negotiate over price, but not over the terms of the Indemnification Certificates, defies common sense.

The evidence that Pentron cites does nothing to refute that it had the power to negotiate over the terms of the Indemnification Certificates.  (*See* Pentron Mem. at 27-28.)  David Mylander testified clearly that "Brush require[d] all its customers to sign this *type* of indemnification certificate."  (Mylander Dep. at 83 (emphasis added).)  Likewise, the customer letter Pentron points to says that Brush "is requiring that all purchasers . . . agree to and sign *an* indemnification certificate."  (Pentron Mem. at 28 (emphasis added).)  While it is absolutely true that Brush required all customers buying certain products to sign *an* indemnification certificate, the point Pentron fails to acknowledge is that the precise terms of that indemnification certificate were subject to negotiation, and were not presented on a "take it or leave it" basis.  (*See* Brush Suppl. Mem. at 3-5.)  None of the evidence Pentron points to creates a genuine issue of material fact as to that issue.

Pentron cannot now dispute that it  had the very same opportunity as other customers, and cannot now ask the Court to make the very same modifications that other Brush customers were assertive enough to make long ago.  *See Handler v. Southerland Custom Builders, Inc.*, 2006-Ohio-4371, ¶¶ 20-25, 2006 WL 2441673, at *4 (Ohio Ct. App. Aug. 24, 2006) (arbitration clause of a contract was not unconscionable, because plaintiffs had an opportunity to negotiate over the terms of the contract).

*Third*, even if Brush was "the sole *fully integrated* source of pure beryllium" – in other words, the only seller that was also a manufacturer – during the years 1980 to 1993 (Pentron Mem. at 25 (emphasis added)), the undisputed evidence demonstrates that Pentron at all times had several alternatives to purchasing from Brush.  Dr. Prasad testified that even before turning

to Brush for pure beryllium, Pentron produced its Rexillium product using a master nickel-beryllium *alloy* from a company named Kawecki Berylco, but he decided to switch to Brush instead "[f]or quality reasons."  (Prasad Dep. at 11-15.)  Pentron could have continued to use a master alloy – as did its codefendant in *Hill* and *Blackstock*, Jensen Industries.  (Schittina Dep. at 147, in *Hill v. Brush Engineered Materials, Inc., et al.*, attached as Suppl. Ubersax Aff., Ex. 4.)  Pentron also could have purchased and used pure beryllium scrap.  Dr. Prasad was well aware that pure beryllium scrap was available, and even that Pentron's competitors used it, but he preferred not to use it because it was not delivered in the size and shape that Pentron wanted.  (Prasad Dep. at 45, 47-50, 64-65.)  And Pentron certainly could have chosen not to use beryllium at all in its alloys, again just as Jensen Industries and other of Pentron's competitors eventually chose to do.  (*See, e.g.*, Schittina Dep. at 142-43, in *Hill v. Brush Engineered Materials, Inc., et al.*, attached as Suppl. Ubersax Aff., Ex. 4.)

The fact that using Brush's pure beryllium might have been more profitable for Pentron than these other alternatives does not mean that Pentron lacked a meaningful choice in purchasing Brush's product.  Indeed, the law is exactly the opposite:  "That a company bargains from a position of need and would consider it inadvisable to engage in a particular enterprise unless access to specific resources were available cannot be construed as a coercion which offends public policy."  *Glaspell v. Ohio Edison Co.*, 505 N.E.2d 264, 267 (Ohio 1987).

In short, Pentron does not – and cannot – offer any legitimate ground for holding the Indemnification Certificates to be procedurally unconscionable.  The circumstances here are no different from the many cases in which Ohio courts have refused to find procedural unconscionability in a contract between sophisticated commercial parties.  *See, e.g.*, *Cleveland Mack Leasing, Ltd. v. Chef's Classics, Inc.*, 2006 WL 459269, at *6 (Ohio Ct. App. Feb. 24,

2006) (defendant could not establish procedural unconscionability because "[t]he bargaining power of the two parties seems to be equal," "both parties are business entities," and "there is no evidence in the record that even suggests that there was a severe imbalance of bargaining power when the contract was entered into"); *Young v. Rollins Leasing Corp.*, No. L-78-137, 1979 WL 207397, *5 (Ohio Ct. App. Dec. 7, 1979) ("no combination of circumstances appear in the record which lend themselves to findings of either procedural or substantive unconscionability in a commercial setting").  Although Pentron argues that "a commercial purchaser is not doomed to failure in pressing an unconscionability claim" (Pentron Mem. at 24 (quoting *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 639 (Ohio 1989) (internal quotations omitted)), it does not cite a single case in Ohio in which such a claim succeeded, and Brush is not aware of one.  This is hardly an appropriate first case for extending consumer protections to a garden-variety commercial transaction.

**III.     There is No Genuine Dispute of Material Fact on the Issue of Damages.**

Pentron argues that summary judgment cannot be granted in Brush's favor because Brush supposedly has not proven its damages.  (Pentron Mem. at 21-22.)  This argument, of course, is based entirely on Pentron's belief that it need only indemnify Brush with respect to "specific sales" of beryllium.  According to Pentron, Brush must show "which of its costs were in fact the result of its sale to Pentron of contractually covered quantities of beryllium."  (*Id.* at 22.)  But that is not what the Indemnification Certificates say.

Again, the Certificates provide that Pentron will indemnify Brush against *any* lawsuits or expenses relating in *any* way to beryllium that Brush may be subject to because of its status as a beryllium supplier to Pentron.  Nowhere do they say that costs must somehow be apportioned to account for a plaintiff's claim that other alloy makers also caused the plaintiff's harm.  As discussed above, all four underlying plaintiffs have subjected Brush to liability by reason of its

sale, supply, or shipment of beryllium to Pentron.  Thus, Pentron is clearly liable for Brush's costs in each of these lawsuits.

Pentron nowhere disputes the expenditures documented in the Affidavit of Theresa Haumann that Brush filed with its summary judgment motion in April 2005.  And it does not deny that it has had every opportunity to scrutinize these expenditures when Brush produced its legal bills from *Blackstock*, *Hill*, *Millangue* and *Simon*.  Additional subsequent expenditures are documented in the Supplemental Affidavit of Theresa Haumann (filed under seal on June 28, 2007).[7]

## CONCLUSION

The Court should deny Pentron's motion for partial summary judgment as well as its motion in the alternative for complete summary judgment, and instead grant Brush's motion for summary judgment.

Dated:  July 3, 2007                                          Respectfully submitted,


                                          /s/ Jeffery D. Ubersax
                                          Jeffery D. Ubersax
                                          Jones Day
                                          901 Lakeside
                                          North Point
                                          Cleveland, OH  44114
                                          216/586-3939 Office
                                          216/579-0212 Fax

                                          Attorney for Plaintiff Brush Wellman Inc.

---

[7]        Brush continues to incur expenses in the ongoing *Hill* case; to that extent, its damages cannot yet be finally determined.  It may therefore be appropriate for the Court to enter a partial summary judgment on liability and reserve for later determination the amount of damages.  (The parties may be able to agree upon this amount if Pentron is adjudged liable.)

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 3, 2007, the foregoing Brush Wellman Inc.'s Amended Opposition to Jeneric/Pentron Inc.'s Cross-Motion for Summary Judgment and Reply In Support of Brush's Motion for Summary Judgment.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Jeffery D. Ubersax
Attorney for Plaintiff Brush Wellman Inc.