**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **BRUSH WELLMAN INC.,** ) | **CASE NO.  1:03CV2305** |
| ) | **1:04CV721** |
| ) | |
| **Plaintiff,** ) | **JUDGE CHRISTOPHER A. BOYKO** |
| ) | |
| vs. ) | **OPINION AND ORDER** |
| ) | |
| **JENERIC PENTRON INC., et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**CHRISTOPHER A. BOYKO, J**.:

This matter comes before the Court upon the Motion (ECF DKT #32) of Plaintiff, Brush Wellman Inc.("Brush"), for Summary Judgment; Brush Wellman Inc.'s Supplemental Memorandum (ECF DKT #74) in Support of its Motion for Summary Judgment; and the Motion (ECF DKT #77) of Defendant, Jeneric/Pentron, Inc. ("Pentron") for Partial Summary Judgment and Motion in the Alternative for Complete Summary Judgment.  For the reasons that follow, the Motion of Brush for Summary Judgment is granted as to liability only; and Pentron's Motions are overruled on the same issue.  Separate briefing on damages and attorney's fees is ordered in accordance with this Opinion.

**I. FACTUAL BACKGROUND**

On November 12, 2003, Brush filed an action in this Court, claiming damages based upon express indemnification and equitable indemnity, and seeking declaratory judgment. Pentron filed its own declaratory judgment action in the Southern District of Texas, alleging

Brush is not entitled to indemnification.  Brush's request to transfer Pentron's case to the Northern District of Ohio was granted, and the two cases were consolidated.

Brush is an Ohio corporation with its principal place of business in Cleveland, Ohio. Brush manufactures beryllium and beryllium-containing products.  The parties stipulated, on April 9, 2007, that, during the years 1980 through 1993, Brush Wellman was the sole fully-integrated source of pure beryllium from which Jeneric Pentron could purchase pure beryllium.  Pentron is a Connecticut corporation with its principal place of business in Wallingford, Connecticut.  The second Defendant, Pentron Laboratory Technologies, LLC ("PLT"), is a subsidiary of Jeneric Pentron and has assumed all of Jeneric Pentron's obligations and liabilities at issue in the captioned lawsuits.[1]

During the 1980's and 1990's, Brush contracted to provide Pentron with pure, vacuum-cast beryllium.  Pentron melted the beryllium with larger quantities of other metals to produce dental alloys, one known as Rexillium.  Rexillium contained less than 2% beryllium.  Pentron would then sell Rexillium to dental laboratories, which used it to make dental prostheses, such as bridges and crowns.  Pentron's purchases of beryllium were negotiated by its Senior Vice President, Dr. Arun Prasad ("Prasad"), from 1985 to 1995.

Beginning in 1989, Brush required buyers, such as Pentron, to execute written indemnification and hold-harmless agreements ("Indemnification Certificates"), as part of each sales transaction. The Indemnification Certificates were accompanied by a cover letter, which stated in pertinent part:

---

[1]  For the purposes of this Opinion, the Court will refer to the Defendants in the singular and by the designation, "Pentron."

"The reason we are requiring this certificate is to make sure our customers recognize the fact that Brush Wellman's liability ends after properly informing the customer of the potential health hazards associated with handling beryllium."

The Indemnification Certificates contained two paragraphs.  In the first, the Buyer acknowledged it had received warnings from Brush and was aware of the hazardous nature of beryllium:

"Buyer represents and warrants to Brush Wellman Inc. ... that from Buyer's own review and study, Buyer is fully aware of , and knowledgeable about: (a) the health hazards associated with beryllium including specifically the melting of beryllium and the handling of metallic beryllium powder and chemicals; (b) the industrial hygiene controls necessary to protect its workers from the health hazards associated with beryllium; (c) the need to adequately warn of the health hazards associated with beryllium; and (d) the governmental regulations regarding the use of beryllium products.  Buyer further represents and warrants that, although additional warnings regarding the health hazards posed by beryllium are unnecessary given its own knowledge, [Brush] has fully and adequately warned Buyer of such health hazards."

In the second paragraph, the Buyer agreed to indemnify and hold Brush harmless as follows:

"The Buyer agrees to indemnify and hold harmless Seller, its subsidiaries, affiliates, successors, assigns, directors, officers, employees, agents and representatives (collectively "Seller") **against any demands, claims**, **lawsuits, liability, damage, judgment, expense or loss (including legal fees, expenses and costs)** *relating in any way to beryllium* (including without limitation its use, sale or supply; method of fabrication by Buyer; its quality or merchantability; health hazards associated with its use; or, any warnings or protective devices) **which Seller may incur or become subject to** *by reason of its sale, supply or shipment* **of beryllium-containing products** *to Buyer*, **including without limitation any claims or lawsuits by employees of the Buyer, by any customer of the Buyer, or by any other third party**.  In the event any such demand, claim or lawsuit is brought against Seller, Buyer will fully cooperate with Seller in defending such demand, claim or lawsuit."  (Emphasis added.)

Each of the Indemnification Certificates between Brush and Pentron (dated October 23, 1989, October 4, 1990, October 22, 1991, October 19, 1992 and December 15, 1993) was executed by Prasad, on behalf of Pentron.  Each Certificate preceded a delivery of beryllium

in the subsequent year; except for the last Certificate, which preceded the purchase and shipment of twelve hundred pounds of beryllium over the 1994-1995 time period.  At various times, Dr. Prasad negotiated the price of the beryllium, but never objected, nor asked to change the terms of the Indemnification Certificates.

In 2003, a complaint was filed against both Brush and Pentron, entitled *Millangue*, *et al. v. Jeneric/Pentron, Inc., et al.*, Case No. 02- 62300-4, Nueces County, Texas.  Plaintiff-decedent allegedly died as the result of exposure to dental alloys manufactured by Pentron from beryllium produced by Brush, while employed as a dental technician at Cummins Dental Ceramics between 1981 and 2001.

Also in 2003, a complaint was filed against both Brush and Pentron, entitled *Simon*, *et al. v. Brush Wellman, Inc., et al.*, Case No. 03-CA-6597-AO, Palm Beach County, Florida.  Plaintiff allegedly contracted chronic beryllium disease from exposure to dental alloys between 1985 and 1995.

In 2005, a complaint was filed against both Brush and Pentron, entitled *Hill v. Brush Engineered Materials Inc.*, Civ. Action No. WMN 05CV254, United States District Court for the District of Maryland, Baltimore Division.  Plaintiff alleges she developed chronic beryllium disease as the result of exposure to dental alloys manufactured by Pentron and its competitor, Jensen Industries, when employed by Roy-L Dental Labs between 1992 and 2004.

Again in 2005, a complaint was filed against both Brush and Pentron, entitled *Blackstock, et al. v. Jensen Pentron, Inc., et al.*, No. 251-04-991-CIV (removed and now docketed as 05-cv-00163-WHB-AGN, United States District Court for the Southern District

of Mississippi.  Plaintiff alleges injuries resulted from exposure to dental alloys between 1980 and 2003 while employed at Blackstock Dental Lab.[2]

Pentron points out that the exposure in *Millangue* and *Simon* occurred well before the first Indemnification Certificate was executed.  In *Hill*, Pentron notes it first sold Rexillium to Roy-L Dental Labs on February 14, 1996, months after it received the last beryllium shipment from Brush and after Pentron began purchasing from a Russian source.  Yet, Brush counters that the Second Amended Complaint in *Hill* alleges exposure to Rexillium in the period from 1980 to 1988, when Brush was Pentron's only source of beryllium.  As for *Blackstock*, Pentron asserts it only made small shipments of Rexillium to Blackstock Dental Lab in 1981 and 1982, before the date of the first Indemnification Certificate; while its competitor, Jensen suppled Blackstock over an extensive period of time.

Brush made formal demand for indemnification, which Pentron refused.  Brush seeks judgment declaring Pentron must fully indemnify Brush against any claims, demands, losses, expenses (including legal fees and costs), damages, lawsuits, judgments, settlement payments and/or liability Brush has or will incur as the result of the state court claims.  Also, Brush seeks an award of the attorney's fees incurred in defense of the underlying suits, as well as those incurred in litigating these indemnification actions.

For its part, Pentron seeks judgment in its favor, contending (1) the Indemnification Certificates apply only to damages incurred by reason of specific sales of beryllium Brush made to Pentron between 1990 and 1995; (2) the contracts are unconscionable and

---

[2]   Per advice of counsel, all four product liability cases for which Brush seeks indemnification have now been resolved , either by voluntary dismissal or settlement.

unenforceable as a matter of law; and (3) unresolved issues of material fact, in any event, preclude summary judgment for Brush on damages.[3]

## II. LAW AND ANALYSIS

**Standard of Review**

**Motion for Summary Judgment**

A summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See, Fed. R. Civ. P. 56(c).  The burden is on the moving party to conclusively show no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F. 3d 1339, 1347 (6th Cir. 1994); and the court must view the facts and all inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim.  *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F. 3d at 1347; *Lee v. Ritter*, No. 1:02-CV-282, 2005 WL 3369616, at *2 (E.D. Tenn. Dec. 12, 2005). This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact.  *Betkerur v. Aultman Hospital Ass'n.*, 78 F. 3d 1079, 1087 (6th Cir. 1996);

---

[3]    Upon review of the dispositive motion briefs, it is apparent Pentron has abandoned its argument concerning § 82.001 of the Texas Civil Practice and Remedies Code, which places the burden of indemnity on the manufacturer and not the seller.

*Guarino v. Brookfield Township Trustees*, 980 F. 2d 399, 404-06 (6th Cir. 1992).  The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323; *Lee*, 2005 WL 3369616 at *2.  Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F. 3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

**Contract Interpretation**

The parties do not dispute that any issues of interpretation of the Indemnification Certificates shall be decided under the law of the state of Ohio.  Pentron contends each Indemnification Certificate applies only to the specific sale of beryllium in connection with which it was executed, and should not be interpreted to apply retroactively.  Whether a contract is ambiguous is a matter of law for the Court.  *Latina v. Woodpath Dev. Co.*, 57 Ohio St. 3d 212, 214 (1991).  The ambiguity must appear on the face of the contract; and extrinsic evidence cannot render an otherwise unambiguous contract provision ambiguous.  *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St. 3d 635, 638 (1992).  The Court must interpret the contract as a whole.  *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (2003).  "If the language used by the parties [in a contract] is plain, complete, and unambiguous, the intention of the parties must be gathered from that language, and from that language alone."  Williston on Contracts § 31:4.

-7-

**Contractual Indemnity**

Agreements for indemnification, though once disfavored under early common law, are generally enforced, absent defined public policy exceptions.  See *Allen v. Standard Oil Co.*, 2 Ohio St. 3d 122 (1982).  Where the agreement protects an indemnitee from the financial consequences of his own negligence, and where there is no realistic opportunity to bargain afforded, Ohio law requires narrow construction of the language.  *Glaspell v. Ohio Edison Co.*, 29 Ohio St. 3d 44, 46-7 (1987).  Not so, however, "when such burden of indemnification was assented to in a context of free and understanding negotiation."  *Glaspell*, 29 Ohio St. 3d at 47 (citing Williston on Contracts).

"The nature of an indemnity relationship is determined by the intent of the parties as expressed by the language used."  *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St. 3d 238, 240 (1987); see *Cleveland Window Glass & Door Co. v. National Surety Co.*, 118 Ohio St. 414 (1928).  "All words used must be taken in their ordinary and popular sense."  *Glaspell*, 29 Ohio St. 3d at 47.  "When a * * * [writing] is worded in clear and precise terms; when its meaning is evident, and tends to no absurd conclusion, there can be no reason for refusing to admit the meaning which * * * [it] naturally presents."  *Worth*, 32 Ohio St. 3d at 240-1; quoting *Lawler v. Burt*, 7 Ohio St. 340, 350 (1857).

**Unconscionability**

A contract is unconscionable, under Ohio law, "where one party has been misled as to its meaning, where a severe imbalance of bargaining power exists, or where the specific contractual clause is outrageous."  *Garrett v. Hooters-Toledo*, 295 F. Supp. 2d 774, 779 (N.D. Ohio, W. Div. 2003), citing *Cross v. Carnes*, 132 Ohio App. 3d 157, 170 (1998).

"Unconscionability is generally recognized to include an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party." *Garrett*, 295 F. Supp. 2d at 779, citing *Collins v. Click Camera & Video, Inc.*, 86 Ohio App. 3d 826, 834 (1993). Nevertheless, "findings of unconscionability in a commercial setting are rare." *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 55 (1989), citing *Salt River Project Agricultural Improvement & Power Dist. v. Westinghouse Elec. Corp.*, 143 Ariz. 368, 374 (1984).

The doctrine of unconscionability encompasses both "substantive unconscionability, i.e., unfair and unreasonable contract terms," and "procedural unconscionability, i.e., individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible." *Garrett, supra*; *Jeffrey Mining Prods. L.P. v. Left Fork Mining Co.*, 143 Ohio App. 3d 708, 718 (2001). "A certain 'quantum' of both substantive and procedural unconscionability must be present to find a contract unconscionable." *Garrett, supra*; *Collins*, 86 Ohio App. 3d at 834.

Pentron asks this Court to interpret the Indemnification Certificates before it as applying only to the specific sales of beryllium Brush made to Pentron between 1989 and 1995. This Court cannot comply with that request and still fulfill the obligation imposed upon it by law.

In pertinent part, the Indemnification Certificates recite:

> [Pentron] agrees to indemnify and hold harmless [Brush] . . . against any demands, claims, lawsuits, liability, damage, judgment, expense or loss (including legal fees, expenses and costs) relating in any way to beryllium . . . which [Brush] may incur or become subject to by reason of its sale, supply or shipment of beryllium-containing products to [Pentron], including, without limitation any claims or lawsuits by employees of [Pentron], by any customer of [Pentron],or by any other third party.

The Court is legally bound to give these words their plain and popular meaning.  *Glaspell*, *supra*.  The language is not vague, ambiguous, nor capable of more than one definition.  Neither this paragraph, nor the one preceding it, dealing with known health hazards, references any time period.  In fact, the wording is not limiting in any fashion as to the time of sale, shipment or supply to Pentron, as to the application to beryllium, nor as to the scope of losses incurred by, and compensable to, Brush.

Pentron pleads with the Court to consider the parties' course of dealing as demonstrating the "shared intent" to restrict indemnity only to particularized transactions.  Specifically, Pentron points out that the Certificates "accompanied" five discrete shipments, taking place after 1989, and that the Certificates were referenced in those shipping documents and invoices.  Pentron's contention holds some appeal.  However, this Court must define the indemnity relationship from the words the parties themselves use.  *Worth, supra*.  When the language is clear and plain, the Court need not, and shall not, look to extrinsic evidence or to contemporaneous statements or actions to ascertain the parties' contractual relationship and the obligations flowing from it.

Pentron argues further that Brush's interpretation of the indemnification agreements is unreasonable.  If the meaning of the language in a single Certificate is so broad and far-reaching, Pentron contends there is no reasonable justification for executing separate Indemnification Certificates in each year from 1989 on.  Yet, it is just as rational to accept Brush's explanation that it felt it necessary each time it sold the beryllium product, to re-emphasize the health risk, and to repeat that any sale would be conditioned upon Pentron's indemnification obligation.

-10-

Pentron insists Brush must prove what losses it incurred as the result of the sales represented by the five executed Indemnification Certificates. Brush points out the plaintiffs in the underlying state cases only had to show exposure to beryllium sold by Brush to Pentron was *a* proximate cause of their injury. It follows logically, then, even if there were other causes, the losses to Brush in the four underlying cases were incurred ***by reason of*** the sale, supply or shipment of beryllium by Brush to Pentron, prior to 1989 or thereafter.

Pentron makes the argument the Indemnification Certificates cannot legally be interpreted to apply retroactively, in the absence of express language evidencing an intent not to restrict indemnification to future losses, but to specifically cover past and existing losses. Pentron relies upon the Restatement 2d of Contracts and U.S. District Judge Patricia Gaughan's opinion in *Prim Securities, Inc. v. McCarthy*, Case No. 05CV783 (N.D. Ohio, August 10, 2006). The *Prim* case is distinguishable from the matter at bar. There, Judge Gaughan made the finding that the entire contract, of which the indemnity clause was only a part, was "forward-looking." The Indemnification Certificates here are not part of a larger document. Further, as has been noted, there is no expression of a future time or that the obligation to indemnify would only operate from the date of the executed Certificate forward. Pentron is correct to cite the Restatement, and to identify examples of unenforceable agreements which seek to obligate a party to liabilities already existing or pre-dating the signed contracts. However, that same infirmity is not present here. Public policy does not bar retroactive application, i.e, application to a prior sale, supply or shipment, since none of the "losses" claimed by Brush were sustained before the date the Certificates were signed. All the underlying suits were filed in 2003 and after.

Pentron strenuously asserts the Indemnification Certificates are unconscionable contracts of adhesion and are unenforceable *in toto*. In order for this Court to make that determination, there must be a "quantum" of both procedural and substantive unconscionability present. There is not.

According to Pentron, Dr. Prasad, on behalf of the company, had no meaningful choice but to sign the Certificates. Moreover, the sweeping terms of the Certificates are unreasonably favorable to Brush and oppressive to Pentron.

Under Ohio law, the Court examines "the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible." *Garrett*, 295 F. Supp. 2d at 783; *Cross*, 132 Ohio App. 3d at 170.

First, Pentron and Brush Wellman are sophisticated commercial entities. Pentron describes its enterprise as "the leading manufacturer worldwide for the full spectrum of high quality non-precious alloys for dental applications." Pentron's Senior Vice President, Dr. Prasad, holds a PhD in metallurgy; so, his education, analytical skills and particularized industry knowledge cannot be questioned.

Next, although presented on preprinted forms, Pentron has not complained the Certificates had to be signed under time constraints, without the opportunity for reflection or thoughtful review. Further, no claim has been lodged that Pentron was denied the opportunity to consult with counsel before executing the Indemnification Certificates.

Pentron maintains it had no meaningful choice because Brush was the sole integrated

source of pure beryllium during the pertinent time period.  Pentron, consequently, was compelled to enter into the indemnity agreements or be denied the raw material necessary to its business.  Yet, Pentron does not dispute that it had choices.  Pentron could have used a master nickel-beryllium alloy from another supplier, but it chose to use pure beryllium.  Pentron could have purchased pure beryllium scrap elsewhere; but made a business decision, i.e., pure beryllium enhanced the quality of its product, Rexillium.  As a matter of fact, Pentron could have opted not to utilize beryllium at all.  Certainly, then, Pentron had options; and by electing to manufacture with pure beryllium and to deal with Brush, it had to accept the benefits and the burdens of the business relationship.

Indisputably, all of Brush's customers were required to execute Indemnification Certificates.  The evidence is equally clear that other customers refused to sign the contract as presented and negotiated the terms of their obligations.  One bargained for mutual indemnity.  Another agreed to indemnify Brush only for the buyer's own negligence or intentional acts.  One customer struck the indemnification and only acknowledged the health warnings.  Another added language defining "covered claims."  Time modifications included: two-year terms only; exclusion of indemnity for future orders; providing indemnification solely for transactions after the date of the Certificate.  Another agreement provided the customer would fully cooperate in defense of a claim against Brush, only at the customer's option.  The bottom line is:  Pentron did not object to the terms of the Indemnification Certificates and did not ask to negotiate them, though Pentron was savvy enough to negotiate price.

In light of all of the above, this Court does not find procedural unconscionability exists.

With regard to substantive unconscionability, there is no question the Indemnification Certificates operate in Brush's favor and to Pentron's disadvantage.  Nevertheless, this Court believes the description provided by the Ohio Supreme Court in *Glaspell,* 29 Ohio St. 3d at 267, is *apropos*: "The parties in the case before us are commercial enterprises of sufficient size and quality as to presumably possess a high degree of sophistication in matters of contract."  Looking carefully at the background and commercial setting of this transaction, involving the marketing of a hazardous metal, beryllium, available only from limited sources in its pure form, the Court determines Brush and Pentron are uniquely knowledgeable, qualified and sophisticated commercial entities.  The terms of the Indemnification Certificates, in that context, are clear, unambiguous, and "precise in their allocation of the risk of doing business."  See *Standard Oil*, 2 Ohio St. 3d at124, quoting *Lawler*, 7 Ohio St. at 350.  "[T]he contract is neither oppressive nor unfair.  Both parties realized that its purpose was to allocate the risks associated with this type of transaction."  *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc*., 358 F. Supp. 449, 460 (E.D. Mich. 1972), *aff'd*, 509 F. 2d 1043 (6th Cir. 1975) (citing *K. & C. Inc. v. Westinghouse Electric Corporation*, 437 Pa. 303 (1970)).  In conclusion, as between Brush and Pentron, the indemnification agreements shall be enforced, even if one party, i.e., Brush, holds a superior bargaining position.

### III. CONCLUSION

For the foregoing reasons, the Motion of Brush Wellman for Summary Judgment is granted as to liability only, and Pentron's Cross-Motions are denied.  This Court declares Pentron must fully indemnify Brush against any claims, demands, losses, expenses (including legal fees and costs), damages, lawsuits, judgments, settlement payments and/or liability

Brush has or will incur as the result of the underlying *Millangue*, *Hill*, *Simon* and *Blackstock* cases.

By letter of November 16, 2007, Brush's counsel (copy to defense counsel) advised the Court that all four of the product liability cases for which Brush seeks indemnification have been resolved, by voluntary dismissal or settlement.

Therefore, by the close of business on January 7, 2008, the parties shall submit a joint statement (which may be under seal) of the resolution of the four underlying cases.

Also, by the close of business on January 7, 2008, Brush shall file an itemized statement and evidence, verified by affidavit, of all its defense costs and damages resulting from those product liability cases.

By January 14, 2008, Pentron shall file an Opposition Brief, with objections.

There will be no Reply Briefs allowed.

By January 24, 2008, the parties shall file Cross-Motions on the recoverability of an award of attorney's fees to Brush for prosecuting the instant declaratory judgment action to enforce the Indemnification Certificates.

**IT IS SO ORDERED.**

**DATE:   January  3, 2008**

   S/Christopher A.  Boyko
**CHRISTOPHER A. BOYKO**
**United States District Judge**