**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BRUSH-WELLMAN, INC., | ) | |
| | ) | CASE NOS.  1:03-CV-02305 |
| Plaintiff, | ) | 1:04-CV-00721 |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| JENERIC/PENTRON, INC., *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | 1:03-CV-02305, Doc. Nos. 86, 92 |
| | ) | 1:04-CV-00721, Doc. No. 64 |

These cases are before the magistrate judge on consent of the parties.[1]  The cases

were consolidated and involve the indemnification of plaintiff, Brush-Wellman, Inc.

("Brush"), by defendants, Jeneric/Pentron, Inc. ("J/P") and Pentron Laboratory

Technologies, LLC ("Pentron Tech";[2] collectively, "Pentron"), in four cases ("the underlying

cases"[3]) and Brush's litigation against Pentron in this court to enforce that indemnification

("the enforcement action").  Before the court is the application of Brush for attorney's fees

---

[1]  Judge Boyko determined on summary judgment that Pentron was liable to Brush for Brush's attorney's fees incurred in four earlier cases.  Judge Boyko then referred the matter to the magistrate judge for a report and recommendation regarding the recoverability of Brush's fees incurred in prosecuting the declaratory judgment action to enforce the indemnification certificates and for a determination of the amount of defendants' liability for plaintiff's attorney's fees in the four earlier cases.  The parties subsequently consented to the jurisdiction of the magistrate judge.

[2]  Pentron Tech is the successor in interest to J/P.

[3]  *See infra*, p. 5, for an identification and description of the four underlying cases.

in the amount of $1,849,647.36.[4]  Doc. No. 86.  Pentron opposes the amount of fees

detailed by Brush.  Doc. Nos. 88, 90, 97.  Also before the court is Brush's motion for

attorney's fees and costs in the amount of $312,264.06[5] for the enforcement action.

Motion, Doc. No. 92.  Pentron opposes Brush's motion.  Opposition, Doc. No. 91.  For the

reasons given below, the court finds that Pentron must indemnify Brush's attorney's fees

in both the underlying cases and the enforcement action in the total amount of

$2,084,846.86.

## I.  Background

Brush is an Ohio corporation with a principal place of business in Ohio.  J/P is a

Connecticut corporation with a principal place of business in Connecticut.  Pentron Tech

is a Connecticut limited liability company with a principal place of business in Connecticut.

The amount in controversy exceeds $75,000.

The parties are largely in agreement regarding the facts of this case.  During the

1980s and 1990s, Brush and Pentron entered into a series of agreements whereby Brush

sold Pentron vacuum-cast beryllium.  Pentron uses beryllium in the manufacture of alloys

for dental crowns and bridges.  Beryllium is an unusually strong metal for its weight but is

toxic when beryllium particles or fumes are inhaled.

---

[4]  Brush submitted attorney's fees totaling $1,896,678.55 in the four underlying cases.  The parties have since filed a stipulation that the amount of attorney's fees in those cases should be reduced by $47,031.19 to $1,849,647.36.  *See* Stipulation, Case. No. 1:03-CV-02305, Doc. No. 122.  Most of the documents referenced in this opinion have been filed in both cases listed above.  Unless otherwise noted, all docket numbers in this opinion refer to Case No. 1:03-CV-02305.

[5]  Brush originally requested attorney's fees in the amount of $269,687.16.  The parties agree in their Stipulation that this amount should be increased by $42,576.90 to $312,264.06.

Arun Prasad, a metallurgist and a senior vice-president for Pentron Tech, negotiated with Brush for the purchase of beryllium.  The negotiations largely consisted of discussions of the price of beryllium, particularly as alternative sources of beryllium became available after the fall of the Berlin Wall.  Deposition of Prasad, Motion for Summary Judgment, Doc. No. 32, Exhs. 21-23. pp. 39-65.  Most of these discussions took place over the telephone or by mail.  Affidavit of Prasad, Opposition, Doc. No. 91, Exh. A, p. ii.  Occasionally, representatives of Brush visited Prasad in Connecticut to discuss purchase agreements between Brush and Pentron.  *Id.*  Prasad asserts, and Brush does not deny, that he never visited Ohio to negotiate the purchase of beryllium.  *Id.*

Almost all of Brush's shipments of beryllium to Pentron were made in conjunction with the sending of a cover letter and an indemnification certificate.[6]  The cover letter accompanying the indemnification certificate read as follows:

> Brush Wellman Inc. is requiring all purchasers of beryllium powder, beryllium chemicals, beryllium vacuum cast lump and beryllium oxide powders agree to, and sign, an indemnification certificate that holds Brush Wellman Inc. harmless against any demands, claims, lawsuits, liability, damage judgement, expense or loss relating in any way to beryllium which Brush Wellman Inc. may incur or become subject  to by reason of its sale, supply or shipment of beryllium - containing products to the purchaser.  This indemnification certificate is to be signed by a person legally authorized to sign on behalf of the company.

> The reason we are requiring this certificate is to make sure our customers recognize the fact that Brush Wellman's liability ends after properly informing the customer of the potential health hazards associated with handling beryllium.  As with any hazardous material in the workplace, it is incumbent upon your managers and supervisors to ensure this knowledge is given to your workers.

> Brush Wellman Inc. will continue to help you educate your employees on

---

[6]  Prasad believes that there was no indemnification certificate in conjunction with the first shipment of beryllium to Pentron.  Thereafter, sending such certificates was the rule, although Prasad notes that he did not always sign them.  Prasad deposition at 93.

beryllium's health hazards, as we have in the past through Material Safety Data Sheets, OSHA videos, etc., for a safe working environment.  If you have any questions concerning this policy, or need assistance from our health and safety professionals, please feel free to contact us at the above address.

First Amended Complaint ("Complaint"), Doc. No. 40, Exh. A (spelling, punctuation, and spacing in the original).  The indemnification certificates read as follows:

   Jeneric/Pentron  , (hereinafter referred to as Buyer) represents and warrants to Brush Wellman Inc. (hereinafter Seller as defined below), that from Buyer's own review and study, Buyer is fully aware of, and knowledgeable about; (a) the health hazards associated with beryllium including specifically the melting of beryllium, and the handling of metallic beryllium powder and chemicals; (b) the industrial hygiene controls necessary to protect its workers from the health hazards associated with beryllium; (c) the need to adequately warn of the health hazards associated with beryllium; and (d) the governmental regulations regarding the use of beryllium products.  Buyer further represents and warrants that, although additional warnings regarding the health hazards posed by beryllium are unnecessary given its own knowledge, Seller has fully and adequately warned Buyer of such health hazards.

    The Buyer agrees to indemnify and hold harmless Seller, its subsidiaries, affiliates, successors, assigns, directors, officers, employees, agents and representatives (collectively "Seller") against any demands, claims, lawsuiits, liability, damage, judgment, expense or loss (including legal fees, expenses and costs) relating in any way to beryllium (including without limitation its use, sale or supply; method of fabrication by Buyer; its quality or merchantability; health hazards associated with its use; or, any warnings or protective devices) which Seller may incur or become subject to by reason of its sale, supply or shipment of beryllium-containing products to Buyer, including without limitation any claims or lawsuits by employees of the Buyer, by any customer of the Buyer, or by any other third party.  In the event any such demand, claim or lawsuit is brought against Seller, Buyer will fully cooperate with Seller in defending such demand, claim or lawsuit.

Indemnification certificate, Complaint, Exh. B (spelling, punctuation, and spacing in the original).  Pentron authorized Prasad to sign documents such as these indemnity certificates on behalf of Pentron.  Prasad deposition at 87.

Prasad did not negotiate the terms of the indemnity certificates.  Representatives of Brush told him that the certificates must be signed before they would deliver beryllium to Pentron.  *Id.* at 93.  Prasad did not try to obtain beryllium without signing these

4

certificates, nor did he discuss or negotiate the terms of the certificates with any representative of Brush.  *Id.* at 93.

Two complaints filed in 2003 named Pentron and Brush as defendants and alleged that an employee of a customer or distributor of Pentron sustained personal injuries as a result of exposure to beryllium in dental alloys manufactured by Pentron.  The cases were *Millangue, et al. v. Jeneric/Pentron, Inc, et al.*, Case No. 02-62300-4, Nueces County, Texas, and *Simon, et al. v. Brush Wellman, Inc. et al.*, Case No. 03-CA-6597-AO, Palm Beach County, Florida.  In 2005, two additional complaints filed by employees of customers or distributors of Pentron named Pentron and Brush as defendants against allegations of injuries due to exposure to beryllium.  Those complaints were filed in *Hill v. Brush Engineered Materials, Inc.*, Civ. Action No. WMN 05CV254, United States District Court for the District of Maryland, Baltimore Division, and *Blackstock et al. v. Jensen/Pentron, Inc. et al.*, a case filed in state court in Mississippi and removed to federal court as Case No. 05-cv-00163-WHB-AGN, United States District Court for the Southern District of Mississippi.  The plaintiffs in these cases alleged that they sustained injuries during the time that Pentron was producing alloys from beryllium supplied by Brush.  In *Blackstock*, Pentron answered that it only made minor shipments of a beryllium compound to Blackstock Dental Lab in 1981 and 1982 while its competitor, Jensen Industries, Inc. ("Jensen"), supplied beryllium compounds to Blackstock Dental Lab over an extended period of time.  Jensen was named as primary defendant in that case.

Brush demanded that Pentron hold Brush harmless and indemnify it in accordance with its obligations pursuant to the indemnification certificates.  Pentron refused, denying that it had any obligation to do so.

5

Pentron filed in the United States District Court for the Southern District of Texas an action for declaratory judgment against Brush on October 17, 2003.  Pentron argued, *inter alia*, that it had no obligation to indemnify Brush because (1) the indemnity agreement attempted to shield Brush against its own negligence and, therefore, was void; (2) the earliest exposure to beryllium in the cases brought against Pentron and Brush occurred in 1981, and Brush did not begin to supply Pentron with beryllium until 1989; and (3) the indemnity agreements were unenforceable adhesion contracts.  On November 12, 2003, Brush filed in this court a complaint against Pentron.  Brush's complaint stated an action in law for breach of contract, stated an action in equity for equitable indemnity, and sought a declaratory judgment regarding its rights under the indemnity agreements.  On April 6, 2004 the Texas court granted Brush's motion to remove Pentron's action to this court, where the actions were consolidated.

Brush moved for summary judgment on April 15, 2005; Pentron moved for summary judgment on June 4, 2007.  On January 3, 2008, Judge Boyko granted Brush's motion and overruled Pentron's motion as to the issue of liability only.  Judge Boyko declared that "Pentron must fully indemnify Brush against any claims, demands, losses, expenses (including legal fees and costs), damages, lawsuits, judgments, settlement payments, and/or liability Brush has or will have as a result of the underlying *Millangue, Hill, Simon* and *Blackstock* cases."  Opinion and order ("Opinion"), January 3, 2008, Doc. No. 83, pp. 14-15.  Judge Boyko also ordered Brush to submit an itemized statement of damages and costs arising from the four underlying cases, ordered Pentron to file an opposition to the statement, and ordered both parties to brief the issue of the recoverability from Pentron of attorney's fees incurred by Brush in prosecuting this federal action to enforce the indemnity

6

certificates.

Brush filed its itemized statement of damages and costs on January 7, 2008.  Doc. No. 86.  Pentron filed objections and supplemental objections to the itemized statement on January 24, 2008 and January 28, 2008.  Doc. Nos. 88, 90, and 97.  On February 4, 2008, Brush moved for attorney's fees and costs attributable to the instant action.  Doc. No. 92. On the same day, Pentron filed an opposition and objection to Brush's request for attorney's fees and costs incurred in the instant action and a supplement to its opposition. Docs. No. 91.  The parties subsequently agreed to proceed before the magistrate judge.

On May 7, 2008, this court held a hearing ("the hearing") to address (1) the appropriate amount of attorney's fees and costs in the four underlying cases for which Pentron should indemnify Brush, (2) whether Pentron should indemnify Brush for the attorney's fees and costs incurred in the enforcement action, and (3) if Pentron should indemnify Brush for attorney's fees and costs in the enforcement action, the appropriate amount of fees and costs for which Pentron should indemnify Brush.  Prior to the hearing, the court ordered that, in the event Pentron decided to present evidence regarding these matters, it was to notify opposing counsel and the court one week before the hearing and provide at that time a list of witnesses, a summary of their testimony, and a list of all exhibits to be introduced at the hearing.  Order, April 3, 2008, Doc. No. 102.

Neither party presented witnesses at the hearing or asked to cross-examine any of the affiants.  Brush filed on April 28, 2008 the affidavits of Jeffrey D. Ubersax, Doc. No. 110, and Theresa R. Hausmann, Doc. No. 111, attorneys for Brush, as hearing exhibits.[7]

---

[7] Pentron filed on May 6, 2008 the affidavit of Margaret Fonshell Ward, counsel for Pentron in the *Hill* case, to rebut assertions made in the April 28, 2008 Ubersax affidavit.

Pentron introduced a demonstrative exhibit at the hearing, sorting Brush's allegedly-problematic attorney billings into a series of categories for ease of discussion. Exhibit Regarding May 7, 2008 Hearing, Doc. No. 116. At the hearing, the court ordered the parties to confer regarding allegedly-duplicative billings and attorney's fees for time spent properly allocating attorney's fees. The court also ordered Brush to file copies of exhibits presented at the hearing. The court granted Pentron an opportunity to submit a two-page brief addressing the cases that Brush submitted during the hearing.

Although Judge Boyko has found Pentron liable for Brush's attorney's fees in the four underlying cases, Pentron contends that the requested fees are not reasonable. Pentron also opposes Brush's motion for attorney's fees in the enforcement action but does not dispute the reasonableness of those fees. Brush argues that its attorney's fees in the four underlying cases were reasonable and that Pentron is liable to pay Brush's attorney's fees incurred in the litigation in this court.

## II.  Choice of law

The parties dispute which law should be applied to a determination of the attorney's fees for which Pentron must indemnify Brush in the four underlying cases and in the enforcement action. Brush argues that Ohio law properly applies to these issues. Pentron argues that Connecticut law applies.

A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3 (1975); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Security Ins. Co. of Hartford v. Kevin Tucker & Assoc., Inc.*,

---

Upon motion by Brush at the hearing, the court struck the Ward affidavit as an untimely filed hearing exhibit.

64 F.3d 1001, 1005 (6th Cir. 1995).  The court, therefore, will apply Ohio choice of law rules to determine which state's substantive law should govern the case.

No party alleges that the contract between Brush and Pentron or the indemnification certificates specify which forum's law to apply to the contract at issue.  When a case sounds in contract and the parties have not specified which state's substantive law should govern the contract, Ohio's choice of law rules require a court to apply the law of the state with the most significant relationship to the contract.  *National Union Fire Ins. Co. v. Watts*, 963 F.2d 148, 150 (6th Cir. 1992).  To determine which state has the most significant relationship to the contract, Ohio has adopted the test set forth in the *Restatement (Second) of Conflict of Laws,* § 188 (1971).  *International Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir. 1996).  The Ohio Supreme Court, in *Nationwide Mut. Ins. Co. v. Ferrin*, 21 Ohio St. 3d 43, 44-45, 487 N.E.2d 568, 569-70 (1986), held that the only controlling law with precedential effect taken from § 188 of the *Restatement* is the language which states:

> In the absence of an effective choice of law by the parties * * *, the contacts to be taken into account * * * to determine the law applicable to an issue include:
> (a) the place of contracting;
> (b) the place of negotiations of the contract;
> (c) the place of performance;
> (d) the location of the subject matter of the contract, and
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Ohio caselaw, however, also requires courts to consider the factors at *Restatement (Second) of Conflict of Laws,* § 6 in conjunction with the factors at *Restatement* § 188:

> (2) . . . [T]he factors relevant to the choice of the applicable rule of law include
> (a) the needs of the interstate and international systems;
> (b) the relevant policies of the forum;
> (c) the relevant policies of other interested states and the relative interests of those

9

states in the determination of the particular issue;
(d) the protection of justified expectations;
(e) the basic policies underlying the particular field of law;
(f) certainty, predictability, and uniformity of result; and
(g) ease in the determination and application of the law to be applied.

*National Union Fire Ins. Co. v. Watts*, 963 F.2d 148, 151 (6th Cir. 1992) (quoting *Macurdy*

*v. Sikov & Love, P.A.,* 894 F.2d 818, 821 n.2 (6th Cir. 1990)).

Application of the five factors at *Restatement*, § 188 slightly favors Ohio or is neutral

as to the applicable law.  The place of contracting is Connecticut because the final act

necessary to make the contract binding on the parties, *i.e.*, the signing of the indemnity

certificates, took place in Connecticut.  *See Bobb Chevrolet, Inc. v. Jack's Used Cars,*

*L.L.C.*, 148 Ohio App. 3d 97, 101, 772 N.E.2d 171, 174 (2002).  Because the indemnity

certificates were not negotiated, the second factor is not applicable.  The place of

performance, *i.e.*, the place in which the indemnity was to be paid, is Ohio.  The subject

matter of the contract is Ohio if the subject matter of the certificates is the indemnification

of Brush, or is indeterminate if the subject matter of the certificates is the claims against

which Pentron is indemnifying Brush.  Brush's and Pentron's place of incorporation and

place of business are Ohio and Connecticut, respectively.

Brush argues that application of the seven factors at *Restatement*, § 6 clearly favors

Ohio:

Ohio has the strongest interest in a case involving the right of an Ohio corporation
to be indemnified by customers, like [sic] Pentron, that sell products in many states
and may thus expose Brush to litigation in many different forums.  For this reason,
Brush  had a "justified expectation" that the Indemnification Certificates would be
interpreted in accordance with Ohio law.  Moreover, the need for "certainty,
predictability, and uniformity" is especially important in this setting:  unless Ohio law
is applied, Brush's Indemnification Certificates could be subject to varying
interpretations from all fifty states in which Brush has customers (and in which
Brush's customers have sold their own products containing Brush's beryllium).  The

10

> choice of Ohio law--as opposed to the laws of the 49 other states in which beryllium-
> containing products are sold--greatly eases the "determination and application of the
> law to be applied" to these Indemnification Certificates.

Motion at 3 (quoting Motion for Summary Judgment at 8).[8]  Brush's expectation that Ohio

law would be applied would have been "justified" only if Brush had inserted a choice of law

clause to that effect in the indemnification certificates.  In addition, there is no reason to

believe that Ohio law is easier to apply than the law of other jurisdictions.  Otherwise,

Brush's arguments are well-taken.  Application of the factors at *Restatement*, § 6 favors

Ohio law.

The factors at *Restatement*, § 188 slightly favor Ohio or are neutral regarding

whether Ohio of Connecticut law should be applied.  The factors at *Restatement*, § 6 favor

Ohio law.  For these reasons, the court will apply Ohio law in determining the appropriate

amount of attorney's fees in the four underlying cases for which Pentron must indemnify

Brush and whether Pentron must indemnify Brush for its attorney's fees in the enforcement

action.

### III.  The Amount of the Indemnity in the Four Underlying Cases

Brush requests indemnification for its attorney's fees in the four underlying cases in

the amount of  $1,849,647.36.  Pentron objects that (1) the billing records lack sufficient

documentation to determine the reasonableness of those fees; (2) application of the factors

in *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St. 3d 143, 569 N.E.2d 464 (1991), dictates

a substantial downward adjustment in the fees; (3) Brush has not exercised "billing

judgment" and its fees are excessive and unreasonable; (4) Brush's time spent defending

---

[8]  Pentron has not addressed these factors in its briefing.

11

the intentional tort claims in *Hill* and *Simon* are not indemnifiable as a matter of public policy; (5) the "Jensen only" fees are not subject to the indemnification certificate; and (6) attorney time devoted to redacting Brush's billing statements is not recoverable from Pentron.[9]  Brush denies the validity of each of Pentron's objections.  The court will examine the first three objections together, then examine the remainder separately.

A.      *Bittner and the reasonableness of Brush's attorney's fees*

Pentron asserts three claims related to the reasonableness of the requested attorney's fees: (1) there is insufficient documentation to assess the reasonableness of Brush's attorney's fees; (2) *Bittner* requires a downward adjustment in Brush's attorney's fees because they are unreasonable, and (3) Brush has failed to exercise "billing judgment," and its requested fees are excessive and unreasonable.  Brush denies that its attorney's fees are insufficiently documented, denies that *Bittner* applies to an assessment of the requested fees, and denies that its fees are unreasonable.

In *Bittner*, plaintiff brought suit pursuant to Ohio's Consumer Sales Practices Act ("CSPA"), Ohio Rev. Code Ch. 1345.  Subsection 1345.09(F0(2) of the CSPA provides in relevant part, "The court may award to the prevailing party a reasonable attorney's fee limited to the work reasonably performed, if . . . [t]he supplier has knowingly committed an act or practice that violates this chapter."  When the defendant settled with plaintiff, plaintiff submitted a request for attorney's fees to the court that exceeded the amount plaintiff had

_____

[9]  Pentron asserted this claim at the hearing.  Brush also claimed that that Brush had failed to segregate properly billings in the four underlying cases from billings in the enforcement action.  The parties have resolved their differences regarding these billings.  *See* Proposed Stipulation re Defense Costs and Damages of Plaintiff, Doc. No. 122.  In any case, as Pentron is liable for fees in the underlying cases and in the enforcement action, Pentron's objection to the failure to segregate these fees is inconsequential.

12

received from defendant in settling the case.  After a hearing, the court awarded an amount somewhat less than had been requested as attorney's fees.  Defendant appealed, and the appellate court substantially reduced the fee award, finding that the amount of attorney's fees was unconscionable given the amount received in settlement.

The Ohio Supreme Court reversed the appellate court.  The Court rejected the notion that the amount of attorney's fees awarded pursuant to Ohio Rev. Code § 1345.09(F) must bear a direct relationship to the dollar amount of the settlement between the consumer and the supplier.  Rather, the court held, "[w]hen awarding reasonable attorney fees pursuant to R.C. 1345.09(F)(2), the trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by application of the factors listed in [Ohio Disciplinary Rule ("DR")] 2-106(B)."  *Bittner*, 58 Ohio St. 3d at 143, 569 N.E.2d at 464.  The court enumerated the factors listed in DR 2-106(B) and discussed their application:

> These factors are: the time and labor involved in maintaining the litigation;  the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent.  All factors may not be applicable in all cases and the trial court has the discretion to determine which factors to apply, and in what manner that application will affect the initial calculation.

*Id.*, 58 Ohio St. 3d at 145-46, 569 N.E.2d at 467.

In reaching this holding, the court looked to the language of the particular statute at issue:

> The statute itself limits the fee award to work "reasonably performed."  Thus, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable

13

      hourly rate.  This calculation provides an objective basis on which to make an initial
      estimate of the value of a lawyer's services."

*Id.*, 58 Ohio St. 3d at 145, 569 N.E.2d at 466.  The court also noted that "[w]here . . the
claims can be separated into a claim for which fees are recoverable and a claim for which
no fees are recoverable, the trial court must award fees only for the amount of time spent
pursuing the claim for which fees may be awarded."  *Id.*, 58 Ohio St. 3d at 145, 569 N.E.2d
at 466-67.

      Ohio courts have used the formula enunciated in *Bittner* for determining an
appropriate award of attorney's fees in cases other than those brought pursuant to the
CSPA.  *See, e.g., West Unity ex rel. Beltz v. Merillat*, 169 Ohio App. 3d 71, 861 N.E.2d 902
(2006) (applying *Bittner* when Ohio Rev. Code § 733.61 allows a prevailing taxpayer
reasonable compensation for a taxpayer's attorney in a taxpayer suit against a municipal
corporation); *Grine v. Sylvania Schools Bd. of Educ.*, 2008 WL 853519 (Ohio App.  March
31, 2008) (applying *Bittner* when a common law tort involves fraud, malice, or insult and
allows an award of proper and reasonable attorney fees); and *Maynard v. Eaton Corp.*,
2007 WL 1176488 (Ohio App. April 23, 2007) (holding that in a common law tort action
reasonable attorney fees may be awarded where punitive damages have also been
awarded and referring to the *Bittner* factors as appropriate in determining whether fees are
reasonable).  In particular, courts have applied the *Bittner* factors in reviewing the propriety
of attorney's fees awarded pursuant to a contractual indemnification that includes
reasonable attorney's fees.  *See, e.g., Don Keyser Co., Inc. v. Sherwin Williams*, 2004 WL
3090221 (Ohio App. Dec. 23, 2004) (applying *Bittner* when indemnification for costs
resulting from a breach of warranty included reasonable attorney's fees); and *B-Right*

14

*Trucking Co. v. Interstate Plaza Consulting*, 154 Ohio App. 3d 545, 798 N.E.2d 29 (2003) (applying *Bittner* when indemnification included reasonable attorney's fees for enforcing or defending rights under a contract)).

Courts have not applied *Bittner*, however, when the indemnification included a duty to defend or when the requirement to reimburse attorney's fees was not limited to "reasonable" attorney's fees. *Allen v. Standard Oil Co.*, 2 Ohio St. 3d 122, 443 N.E.2d 497 (1982) (finding defendant liable for all defense costs and not applying *Bittner* when defendant had an obligation to indemnify and defend and failed to do so); and *Associated Maint. & Roofing Co. v. Rockwell Int'l Corp.*, 1994 WL 109003, at *3 (Ohio App. March 29, 1994) (not applying *Bittner* when contractual indemnification of a surety included indemnification for all loss and expense, including any attorney's fees that surety deemed necessary).  In such cases, the indemnitor has been held liable for all attorney's fees incurred by the indemnitee without assessing their reasonableness.

In the four underlying cases, the indemnification certificates provided as follows: "The Buyer agrees to indemnify and hold harmless Seller . . . against any demands, claims, lawsuiits, liability, damage, judgment, expense or loss (including legal fees, expenses and costs) relating in any way to beryllium . . . ."  The indemnification was not limited to "reasonable" legal fees.  Had Pentron wanted to limit the indemnification to "reasonable" legal fees, it should have bargained for that limitation.  Judge Boyko already has found that other customers of Brush, when presented with Brush's demand to sign the indemnification certificates, negotiated alterations in the indemnification.  Opinion at 13.  If Pentron declined to bargain a limit on the indemnity to "reasonable" legal fees, it is not this court's place to add that term to the parties' agreement.

15

There is a second reason for this court not to apply the *Bittner* factors to the attorney's fees generated by the litigation in the four underlying cases.  The court applying the *Bittner* factors is presumably the same court before which the litigation generating the attorney's fees at issue occurred.  That is the court with the opportunity to observe the course of the litigation, the arguments raised, and the conduct of the parties.  Appellate review of an award of attorney's fees in Ohio is accorded the most lenient standard of review, abuse of discretion, because the court awarding the fees observed the litigation:

> It is well settled that where a court is empowered to award attorney fees . . . , the amount of such fees is within the sound discretion of the trial court.  Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere.  The trial judge which participated not only in the trial but also in many of the preliminary proceedings leading up to the trial has an infinitely better opportunity to determine the value of services rendered by lawyers who have tried a case before him than does an appellate court.

*Bittner*, 58 Ohio St. 3d at 146, 569 N.E.2d at 467 (quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App. 3d 85, 91, 491 N.E.2d 345, 351-352 (1985)).

In the four underlying cases, this court had no opportunity to observe the litigation generating the attorney's fees at issue and has no documents, transcripts, or dockets pertaining to that litigation to allow it to undertake a *Bittner* analysis regarding the reasonableness of the contested attorney's fees.  Pentron did not introduce these matters into evidence and elected not to cross-examine anyone about Brush's counsel fees.  Indeed, it would require an extensive hearing and testimony to analyze the scope of the earlier litigation fully, a task that Pentron chose not to undertake.  The court does not have at its disposal the fact base necessary to conduct a *Bittner* analysis of the requested fees.

This is not to say, however, that when an indemnification agreement fails to expressly limit attorney's fees to "reasonable" attorney's fees and a reviewing court has not

16

observed the course of the relevant litigation, an indemnitor's pocketbook is entirely at the mercy of the indemnitee's unconstrained willingness to spend.  As the court in *Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069 (7th Cir. 2004), noted, an indemnitee suing to obtain indemnification under a contract cannot be certain of prevailing in such a suit. Thus, "the resulting uncertainty about reimbursement" gives the indemnitee "an incentive to minimize its legal expenses (for it might not be able to shift them); and where there are market incentives to economize, there is no occasion for painstaking judicial review." *Id.* at 1075-76.  Similarly,  when an indemnitee and an attorney have entered into "a bona fide contractual arrangement whereby the client has committed to pay the amount billed by attorneys, whether or not it can be recovered from the opposing party . . . the court should not second-guess the workings of the market in determining the reasonableness of the fees and expenses." *Florida Rock Indus. v. United States*, 9 Cl. Ct. 285, 288 (1985).  This is not an estimation of "reasonableness," except to the extent that a fair market defines what price is reasonable:

> Courts award fees at the market rate, and the best evidence of the market value of legal services is what people pay for it.  Indeed, this is not "evidence" about market value; it *is* market value.  Although courts interpolate the word "reasonable" into clauses of this kind, the best guarantee of reasonableness is willingness to pay.

*Balcor Real Estate Holdings, INc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996).

Brush hired attorneys to defend itself, and Pentron promised to reimburse Brush for the costs of that defense.  There is no evidence of fraud or collusion between Brush and its attorneys, and there is no suggestion that Brush failed to pay the bills from its attorneys with due speed as they came due.  Brush  conducted its defense as it thought best under

17

the circumstances, and it paid for the privilege of doing so in an arms-length transaction. That Brush conducted its defense in a manner that does not suit Pentron is irrelevant.  The evidence is that Brush paid a fair market price for its defense.  Pentron, therefore, must reimburse Brush for the cost of that defense.

Even if this court were, in the alternative, to assume that the arms-length transaction between Brush and its attorneys did nothing more than establish a rebuttable presumption of reasonableness for Brush's attorney's fees, Pentron would not gain thereby.  As has already been explained, Pentron has not given this court the facts needed to judge the reasonableness of Brush's attorney's fees.  The court's problem with determining the reasonableness of fees under these circumstances is illustrated by Pentron's contention that the attorney's fees billed in connection with the deposition of Marc Kolanz were entirely unreasonable.  Pentron argues as follows:

> Approximately 120 hours were billed by a variety of attorneys in connection with the deposition of Marc Kolenz.  (Ward Aff., Exhibit H).  The fact that the deposition lasted less than 7 hours makes the 120 hours of attorney time highly questionable; however, when it is considered that Kolanz has been the BW 30(b)(6) deponent for more than ten years and has been deposed at least 20 times during that period (Kolanz depo at 187-89, attached as Exhibit I), the hours and resulting fees are shocking.

Second Supplemental Objections, Doc. No. 97, p. 14.  On its face, 120 hours of attorneys' time for a seven-hour deposition may raise questions.  But the court does not know how complex the issues covered during the deposition were; how much time was needed to ensure consistency with other depositions; the number and complexity of exhibits assembled, prepared, or reviewed in connection with the deposition; or any number of other factors that might have justified the expenditure of attorneys' time.  Pentron has introduced no evidence that the time expended was unreasonable.  It simply raises a facial challenge

18

that amounts to no more than an unsubstantiated argument.  Given the few facts available to the court, the court is unable to say that the fees billed in connection with the Kolanz deposition were unwarranted.[10]

Some of Pentron's objections regarding allegedly excessive attorney's fees are, on their face, without merit.  For example, Pentron's argument that time spent by Brush's attorneys in responding to Pentron's first set of discovery requests was excessive because Brush billed 76 attorney's hours while Pentron billed only 16.5 hours in responding to Brush's requests is puzzling.  The implied presumption that both sets of discovery requests demanded the same number of hours from the opposing side is without any established foundation.

Other objections are speculative and, at most, only possibly meritorious.  For instance, Pentron argues as follows:

> 16 hours were spent answering the First Amended Complaint and 17.5 hours were spent answering the Second Amended Complaint.  A review of the First and Second Amended Complaints . . . discloses that there are only four paragraphs of the Complaint that contain new assertions against BW.  Pentron's counsel accomplished the same tasks in 2.2 hours total.

Second Supplemental Objections at 15 (citation omitted). The Second Amended Complaint added, *inter alia*, details regarding the times and locations of plaintiff's employment in dental laboratories, added an allegation of actual malice to the strict liability claim against Brush, and added details to its allegation of fraudulent concealment against Brush.

---

[10]  The court is particularly mindful of Brush's observation during the hearing that because beryllium is Brush's livelihood, it is willing to spend large sums of money to ensure that no precedent is set that would put at risk the profitability of Brush's beryllium sales. Under such circumstances, investments in attorneys' time that might otherwise seem unreasonable become less so.

Seventeen and a half hours related to answering these new allegations may have been excessive, but such a conclusion is far from clear.  This court cannot say that there are no circumstances that might reasonably warrant the hours billed for these tasks.

Finally, some objections raise reasonable questions about Brush's expenditures. Pentron complains, for instance, that Brush devoted 58 hours to opposing a motion to amend a complaint less than nine months after the case had been filed.  If the opposition encompassed no more than an objection to the timeliness of the motion, this court might agree that this was excessive.  However, objections to a motion to amend could involve a review of whether the new claims were viable.  Again, without further information, Pentron's objections are nothing more than unsupported arguments.

Pentron did not contract to *defend* Brush, an obligation that would have given Pentron some voice in the course of beryllium-related litigation.  Rather, Pentron contracted to *indemnify* Brush, and it did not limit that obligation to reasonable fees alone.  Pentron's contractual obligation left Brush with plenary authority to conduct its defense as it saw fit, constrained only by the bounds of good faith and rationality.  Given that Brush is attempting to prevent setting precedent that would jeopardize its primary income stream and given that the court has very little knowledge of, or reasonable access to, the course of litigation in the underlying cases, demonstrating that a particular billing is unreasonable is enormously difficult.  Moreover, the core of Pentron's problem is that Brush was under no obligation to litigate its cases in accordance with Pentron's preferences.

None of Pentron's objections to Brush's attorney's fees on the grounds that they are excessive convinces the court that any of the billings unreasonable.  Some billings may

20

seem difficult to justify, but none seems beyond justification.[11]  Moreover, Brush paid each

of these bills without any assurance that it would prevail in this litigation.  Brush evidently

found the charges to be within the bounds of rationality.  That Pentron does not is beside

the point.  For these reasons, the court overrules Pentron's objections that the attorney's

fees in the four underlying cases are excessive.

The court also overrules Pentron's objection that the billing records lack sufficient

documentation to determine their reasonableness.  To the extent that reasonableness may

be an issue in judging Brush's attorney's fees, those fees are presumed reasonable, and

it would be Pentron's burden to rebut that presumption, which it does not.  The objection,

therefore, is not well-taken.

**B.**  *The billings for litigating intentional torts in Hill and Simon are not indemnifiable as a matter of public policy*

Pentron contends that it should not be required to indemnify Brush for attorney's

fees expended in defending Brush against intentional torts in the *Hill* and *Simon* litigation

because Ohio public policy prohibits such indemnification.  Pentron details $7,116.50 in

attorney's fees attributable to defending against intentional torts.  Brush replies, without any

detailed analysis,  that the court has already found that Pentron is liable for indemnifying

Brush as to damages, including attorney's fees, resulting from all claims brought against

---

[11]  The Affidavit of Margaret Fonshell Ward, counsel for Pentron in the *Hill* litigation, does little to convince the court otherwise. Doc. No. 115. The affidavit provides the court with a great deal of insight into Ward's conclusions and little insight into the facts underlying those conclusions. The affidavit has some merit as legal argument. It does little, however, to give the court a factual basis for reaching its own conclusions about the excessiveness of Brush's attorney's fees.  The court also views with suspicion the allegations of an adversary, represented as fact, that opposing counsel's interests were similar and that opposing counsel's position was unwarranted.

it in the *Hill* and *Simon* litigation.[12]

In Ohio, "[p]ublic policy is contrary to insurance against intentional torts."  *Wedge Prods., Inc. v. Hartford Equity Sales*, 31 Ohio St. 65, 67, 509 N.E.2d 74, 76 (1987).  This includes contractual indemnification against intentional torts.  *Id.*

Brush does not dispute Pentron's contention that Ohio law prohibits indemnification against intentional torts, nor does it dispute the amount of attorney's fees billed in its defense against intentional torts.  Brush relies instead on a sentence from the conclusion of Judge Boyko's January 3, 2008 Opinion:  "This Court declares Pentron must fully indemnify Brush against any claims, demands, losses, expenses (including legal fees and costs), damages, lawsuits, judgments, settlement payments and/or liability Brush has or will incur as the result of the underlying *Milangue, Hill, Simon* and *Blackstock* cases."  Opinion at 14-15.

Pentron first raised the defense that it was not liable for damages arising from Brush's intentional misconduct in its Answer, Doc. No. 7, p. 5, and again in its Answer to the Amended Complaint, Doc. No. 73, p. 7.  Pentron raised the issue of Brush's intentional torts in its Motion for Summary Judgment, Doc. No. 77, but by way of its argument that damages incurred by reason of Brush's intentional torts were not attributable to Brush's sales of beryllium to Pentron.  Brush's Motion, on the other hand, described itself as raising two issues:  "(1) whether Pentron breached its contract with Brush, and (2) whether Pentron has a valid defense to Brush's action for breach of contract."  Motion for Summary

---

[12]  Pentron asserts that the amount of attorney's fees attributable to litigating the intentional tort claims in the *Hill* and *Simon* litigation is $7,116.50.

Judgment at vi.[13]

Thus, the only argument that Pentron made in the competing motions for summary judgment regarding Brush's intentional torts was that damages incurred by reason of Brush's intentional torts were not attributable to Brush's sales of beryllium to Pentron. Pentron cited no law in support of this proposition.  Pentron did *not* assert that Ohio law (or any other jurisdiction's substantive law) prohibited indemnification against intentional torts. When Judge Boyko issued his opinion, then, the issue of whether Ohio law prohibited indemnification against intentional torts was not before the court.  There is no law of the case, therefore, as regards that issue.[14]

There is no dispute that Ohio law prohibits indemnification against intentional torts, that Brush is now seeking indemnification for attorney's fees attributable to defending itself against intentional torts in the *Simon* and *Hill* litigation, or that the amount expended on such attorney's fees is $7,116.50.  No procedural bar prevents the court from deciding the issue now.  The court overrules Brush's motion for attorney's fees, therefore, with respect to the $7,116.50 expended in defending against intentional torts in the underlying cases and shall reduce the indemnification to Brush by $7,116.50.

───────────────────

[13]  Brush's motion for summary judgment did address, *inter alia*, an issue similar to Pentron's current argument that an indemnity against intentional torts is void as against public policy, *viz.*, Pentron's claim that Texas Civil Rules and Remedies Code § 82.002 prohibited indemnifying parties against their own negligence in a products liability action. *See* Motion at 13-15.  Pentron raised this claim in its Complaint, Doc. No. 1, pp. 6-7, in 1:04-cv-00721.

[14]  Judge Boyko has not entered final judgment regarding liability in this case.  Thus, collateral estoppel does not apply to the issue.

C.     *The attorney's fees attributable to matters related only to Jensen are not subject to the indemnification*

Pentron claims that attorney's fees related to Brush's litigation of matters dealing only with liability resulting from exposure to beryllium in products manufactured by Jensen are not covered by the indemnification certificates.  Brush does not object that Pentron's itemization of attorney's fees attributable only to matters involving Jensen is inaccurate.  Brush replies, however, that because the court has already found Pentron liable for all attorney's fees in the underlying cases, Pentron is attempting to re-litigate a matter that the court has already decided.

Pentron asserted its claim that it should not have to indemnify attorney's fees related only to Brush's liability through sales to Jensen in its Motion for Summary Judgment.  *See* pp. 17-19.  Pentron objected that some of Brush's billings in the *Blackstock* and *Hill* cases represented work devoted exclusively to Brush's liability through its sale of beryllium to Jensen.  Pentron's argument, therefore, was largely focused on the amount of attorney's fees for which it ought to indemnify Brush, rather than on whether it was liable generally for Brush's attorney's fees in the *Blackstock* and *Hill* cases.

Brush's opposition to Pentron's motion for summary judgment argued that Pentron is not relieved from its duty to indemnify merely because a case includes other defendants who also supplied beryllium alleged to have harmed plaintiff.  Brush contended that the indemnification certificates required Pentron to indemnify Brush for expenses incurred "by reason of" its sale of beryllium to Pentron.  According to Brush, because "by reason of" references causation, Pentron was required to indemnify Brush for expenses incurred in any case alleging that exposure to beryllium sold by Brush to Pentron was a substantial

24

factor in causing the plaintiff harm. Thus, Brush concluded, Pentron was not excused from indemnifying Brush merely because most of the exposure to beryllium against which Brush was defending itself in a particular case came from beryllium supplied by Jensen rather than Pentron.  Brush's opposition brief also argued that Pentron's obligation to indemnify Brush is not limited to a proportional share of the harm alleged to have been caused by Pentron's products as opposed to products sold by Jensen.

Brush's arguments in its motion for summary judgment addressed only whether Pentron was liable for indemnifying Brush in any case in which Brush supplied Pentron beryllium alleged to have harmed plaintiff and whether any indemnification should be proportional to the exposure to Pentron-supplied beryllium.  Brush's arguments did not address Pentron's contention that it should not have to indemnify any attorney's fees related only to Brush's liability through sales to Jensen.  Consequently, the law of the case does not bar litigation of this matter.

Litigation issues arising solely from the sale of beryllium to Jensen cannot be said to have been incurred by Brush "by reason of" its sale of beryllium to Pentron. Consequently, such attorney's fees are beyond the scope of the indemnification certificates. For this reason, the court sustains Pentron's objections regarding indemnification of Brush's attorney's fees incurred in litigating matters related only to its liability through beryllium sold to Jensen.

Pentron details $69,948.00 in attorney's fees alleged to have been incurred in litigating matters related only to liability through beryllium sales to Jensen.  Brush has offered no objection to the accuracy of Pentron's representations in this respect.  Inspection of the details of the billings reveals no obvious error in any of Pentron's characterizations

25

of the billings as unrelated to the sale of beryllium to Pentron.  The court accepts the accuracy of Pentron's characterization of these fees, therefore, as beyond the scope of the indemnity certificates and shall reduce the indemnification to Brush by $69,948.00.

D.    *Attorney time devoted to redacting Brush's billing statements is not recoverable from Pentron*

At the hearing, Pentron argued that attorney time devoted to redacting Brush's billing statements is not recoverable from Pentron, particularly as Brush eventually gave Pentron unredacted copies of the billing statements.  Brush replied that the redactions were necessary because the parties were in active litigation against each other and because of the need to protect attorney-client privilege.

Brush initially produced redacted copies of its billing records, claiming that the redactions were necessary to protect attorney-client privilege.  On April 22, 2008, the parties jointly moved for an addendum to the protective order already in place in the enforcement action.  Joint Motion for Entry of Agreed Addendum to Protective Order, Doc. No. 107.  The court granted this motion on the day it was filed.  Order, April 22, 2008, Doc. No. 108.  Upon amendment of the protective order, Brush produced unredacted copies of the billings.

That Brush eventually produced unredacted copies of the billings does not warrant the conclusion that the initial production of redacted copies was erroneous, unnecessary, or futile.  Under the circumstances existing prior to the addition to the protective order, Brush asserted that production of unredacted copies of the billings would have compromised attorney-client privilege.  Pentron has not shown that this assertion was made in bad faith or was in any way erroneous.  Brush required Pentron's co-operation to

26

put in place the addendum that allowed Brush to produce the unredacted billings; this was not something that Brush could have done unilaterally whenever it chose to do so.  It cannot be said, then, that it was unnecessary for Brush to have produced the redacted copies, as Brush believed that circumstances compelled such production and Brush was unable to change those circumstances without Pentron's co-operation.  Nor can one conclude that the initial redacted production was a futile attempt to stave off eventual production of unredacted copies.  The court has not ruled that Brush's initial production was insufficient, and the court did not compel Brush to produce the unredacted billings.  Brush produced the unredacted billings voluntarily after Pentron argued that they were insufficient and agreed to amend the protective order.  As the creation and production of the redacted billings was not erroneous, unnecessary, or futile, Pentron apparently has no ground for claiming that it should not be required to pay for attorney's fees related to the redactions.

Pentron cites no law to support its contention that it should not be required to pay for attorney's fees related to the redactions, and its argument in support of this position is not well-taken.  For these reasons, the court overrules this objection.

IV.  Liability for Indemnification of Attorney's Fees in the Enforcement Action

Pentron contends that it should not be held liable for Brush's attorney's fees in the instant action to enforce the indemnity certificates.  Pentron argues that under Connecticut law it is only required to pay for attorney's fees related to enforcing an indemnification to pay attorney's fees if the indemnification expressly requires the payment of such fees.  The indemnification certificates, Pentron asserts, do not expressly require the payment of such fees.  Pentron also argues that even if Ohio law is applied to the indemnification certificates, it is not liable for Brush's attorney's fees to enforce the indemnification for the

27

same reasons.  Brush replies that whether Connecticut law or Ohio law is applied, Pentron is liable for the payment of the attorney's fees in the enforcement action.

The court already has determined that Ohio law applies to interpretation of the indemnification certificates.  The court will examine the parties' arguments, therefore, in light of Ohio law.

When an indemnity agreement does not expressly require an indemnitor to pay the attorney's fees of an indemnitee in an action to enforce an indemnity agreement, Ohio law nevertheless requires an indemnitor to pay such attorney's fees.  The fundamental statement of Ohio law regarding the indemnification of attorney's fees in an action to vindicate rights under an indemnification clause comes from the second paragraph of the syllabus in *Allen v. Standard Oil Co.*, 2 Ohio St. 3d 122, 122, 443 N.E.2d 497, 497 (1982): "When an indemnitor wrongfully refuses to defend an action against an indemnitee, the indemnitor is liable for the costs, including attorney fees and expenses, incurred by the indemnitee in defending the initial action and in vindicating its right to indemnity in a third-party action brought against the indemnitor."  The Ohio Supreme Court elaborated on this statement five years later in *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St. 3d 238, 242, 513 N.E.2d 253, 257 (1987):  "[A]n indemnitor's express agreement to indemnify an indemnitee for qualified legal expenses incurred is enforceable and is not contrary to Ohio's public policy.   In the event that the indemnitor wrongfully refuses to honor its obligation, the indemnitee may recover its legal expenses."

Pentron argues that, under Ohio law, an indemnitor who loses an action to enforce an indemnity clause must pay the indemnitee's legal fees in the enforcement action when the indemnity clause requires the indemnitor to "defend" but not when the indemnity clause

28

requires the indemnitor to "indemnify."  Pentron errs.  First, such an interpretation of Ohio law runs counter to the plain language of *Worth*.  Second, Ohio courts allow recovery of attorney's fees in the action to enforce an indemnification clause even when the indemnification does not include an obligation to "defend."  *See, e.g., Associated Maint. & Roofing*, 1994 WL 109003.  Third, there is no legal or rational justification for requiring an indemnitor who defaults on its obligation to defend an indemnitee to pay attorney fees in an action to enforce the indemnification but not for requiring an indemnitor who defaults on an obligation to indemnify to pay such fees.  In either case, the harm to the indemnitee is substantially the same.  The remedy of requiring the indemnitor to pay the attorney's fees in the action to enforce the indemnification is necessary to make the indemnitee whole regardless of whether the obligation was to defend or to indemnify.   Consequently, even if the indemnity agreement between Brush and Pentron is read as not expressly requiring Pentron to pay Brush's attorney's fees in the enforcement action, Ohio law nevertheless requires Pentron to pay those fees.

Moreover, the indemnity agreement *should* be read as expressly requiring Pentron to indemnify Brush's attorney's fees in the instant action.  In Ohio, "the first general maxim of interpretation . . . is that it is not allowable to interpret what has no need of interpretation.  When a . . . [writing] is, worded in clear and precise terms; when its meaning is evident, and tends to no absurd conclusion, there can be no reason for refusing to admit the meaning which . . . [it] naturally presents."  *Allen*, 2 Ohio St. 3d at 124, 443 N.E.2d at 499 (quoting *Lawler v. Burt*, 7 Ohio St. 340, 350,1857 WL 52 (1857)) (punctuation in the quoting source).  In interpreting a contract, "[c]ommon words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning

29

is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St. 2d 241, 241, 374 N.E.2d 146, 148 (1978) (paragraph two of the syllabus).  Moreover, "[i]t is not the responsibility or function of th[e] court to rewrite the parties' contract in order to provide for a more equitable result." *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 78 Ohio St. 3d 353, 362, 678 N.E.2d 519, 526 (1997).  "Where a contract is plain and unambiguous . . . , it does not become ambiguous by reason of the fact that in its operation it may work a hardship upon one of the parties." *Id.*, 46 Ohio St. 3d at 55, 544 N.E.2d at 924; *see also Ullman v. May*, 147 Ohio St. 468, 72 N.E.2d 63, 63 (1947) (paragraph one of the syllabus).

The indemnification certificates read in relevant part, "The Buyer agrees to indemnify and hold harmless Seller . . . against any . . . expense or loss (including legal fees, expenses and costs) relating in any way to beryllium . . . which Seller may incur or become subject to by reason of its sale, supply or shipment of beryllium-containing products to Buyer . . . ."  This language is broad and sweeping, but it is not in any way ambiguous.  *See also* Opinion at 10 (finding that the language of the indemnification certificate "is not vague, ambiguous, nor capable of more than one definition").  The attorney's fees borne by Brush in the enforcement action are an expense it incurred by reason of its sale of beryllium to Pentron and upon Pentron's failure to abide by its obligations under the indemnification certificates.  The relationship between the sale of beryllium to Pentron and the attorney's fees in the enforcement action is not as direct as the relationship between the sale of beryllium to Pentron and the attorney's fees in the underlying cases, but Pentron is obliged to pay Brush's attorney's fees "relating in any way" to the sale of beryllium to Pentron.  The express terms of the contract, therefore, require Pentron to pay Brush's attorney's fees in

30

the enforcement action.

Brush submits attorney's fees incurred in the enforcement action totaling $312,264.06.  Pentron does not dispute the reasonableness of these fees. For these reasons, Pentron must indemnify Brush's attorney's fees attributable to the instant case in the amount of  $312,264.06.

## V.  Conclusion

For the reasons given above, Pentron must indemnify Brush's attorney's fees in the four underlying cases, *Millangue, et al. v. Jeneric/Pentron, Inc, et al.*, Case No. 02-62300-4, Nueces County, Texas; *Simon, et al. v. Brush Wellman, Inc. et al.*, Case No. 03-CA-6597-AO, Palm Beach County, Florida; *Hill v. Brush Engineered Materials, Inc.*, Civ. Action No. WMN 05CV254, United States District Court for the District of Maryland, Baltimore Division; and *Blackstock et al. v. Jensen/Pentron, Inc. et al.*, Case No. 05-cv-00163-WHB-AGN, United States District Court for the Southern District of Mississippi, in the amount of $1,772,582.86, calculated as follows:

> Fees submitted by Brush in the four underlying cases . . . . . $1,849,647.36[15]
> Minus fees attributable to intentional tort defense . . . . . . . . $      7,116.50
> Minus fees attributable liability from Jensen sales . . . . . . . . <u>$     69,948.00</u>
> Total fees in the four underlying cases . . . . . . . . . . . . . . . . . $1,772,582.86.

Pentron must also indemnify Brush for its fees in the enforcement action, Case Nos. 1:03-CV-02305 and 1:04-CV-00721 in this court, in the amount of $312,264.06.  Pentron must indemnify Brush, therefore, for its attorney's fees in the total amount of $2,084,846.86.

The court has ordered the parties to brief the matter of whether prejudgment interest

---

[15]  As adjusted by stipulation of the parties.

should apply to this amount.  That matter is now fully briefed.  After the court determines whether prejudgment interest should be applied, the court will issue a final judgment.

IT IS SO ORDERED.


/s/ Nancy A. Vecchiarelli
Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date:  July 2, 2008